

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-28-1997

# Bey v. Morton

Precedential or Non-Precedential:

Docket
95-5608

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Bey v. Morton" (1997). *1997 Decisions.* Paper 212.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/212

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 28, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 95-5608

MARKO BEY
       Appellant

v.

WILLIS E. MORTON, SUPERINTENDENT;
PETER VERNIERO,* ATTORNEY GENERAL

*Pursuant to F.R.A.P. 43(c)

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 94-cv-01735)

Argued February 4, 1997

BEFORE: STAPLETON AND MANSMANN, Circuit Judges,
and POLLAK,** District Judge

(Opinion Filed August 28, 1997)

_____
** Hon. Louis H. Pollak, United States District Judge for the Eastern
District of Pennsylvania, sitting by designation.


       Susan L. Reisner, Public Defender
       James K. Smith, Jr. (Argued)
       Assistant Deputy Public Defender
       Office of Public Defender
       Appellate Section
       31 Clinton Street - 9th Floor
       P.O. Box 46003
       Newark, NJ 07101
       Attorneys for Appellant

       Peter Verniero, Attorney General
       Catherine A. Foddai (Argued)
       Deputy Attorney General
       Office of Attorney General of
        New Jersey
       Division of Criminal Justice
       Richard J. Hughes Justice Complex
       P.O. Box CN086

        Trenton, NJ 08625
        Attorneys for Appellees

OPINION OF THE COURT

STAPLETON, Circuit Judge:

While incarcerated on death row in New Jersey, Marko
Bey engaged in numerous "everyday" conversations with
Corrections Officer Alexander Pearson. These discussions
covered many different topics from sports, to women, to the
news. In the course of their discourse, Bey confessed to the
murders of two women. When Bey's death sentence was
subsequently vacated and the convictions for the murder
and sexual assault of one of the victims were reversed, the
state introduced Pearson's testimony at the retrial, and Bey
was again found guilty and this time received a sentence of
life imprisonment. After Bey's convictions were affirmed on
direct appeal, he sought relief in the district court. Bey now
appeals from the district court's denial of his petition for
habeas corpus relief.

We hold that there was no violation of Bey's Sixth
Amendment right to counsel because there was no

                        2


deliberate elicitation of incriminating information for use in
connection with his prosecution. We also hold that there
was sufficient evidence at Bey's second trial to support the
jury's findings of guilt. Thus, we will affirm the district
court's judgment.

I. FACTUAL AND PROCEDURAL BACKGROUND

The bruised and battered body of Cheryl Alston was
found by a jogger on April 2, 1983, in a vacant lot across
the boardwalk from the beach in Ocean Grove, Neptune
Township, New Jersey. A police investigation ensued, and
Bey was arrested on May 6, 1983. On December 13, 1983,
he was convicted for the murder, felony murder, aggravated
assault, and aggravated sexual assault of Alston and two
days later was sentenced to death. The New Jersey
Supreme Court vacated Bey's death sentence on August 2,
1988, because he had been a juvenile at the time of the
offense and was therefore not eligible for the death penalty.
See State v. Bey I, 548 A.2d 846 (N.J. 1988). The Court also
reversed the convictions, remanded the case, and ordered
the suppression of Bey's confession to the police.

In a separate prosecution, Bey was also convicted of
murdering Carol Peniston in 1983. On the day that the New

Jersey Supreme Court vacated Bey's convictions for the Alston murder, the Court also vacated the death sentence he received for the Peniston murder, but affirmed his conviction in that case, see State v. Bey II, 548 A.2d 887 (N.J. 1988). Bey has since been again sentenced to death for the Peniston murder. See State v. Bey, 645 A.2d 685 (N.J. 1994); State v. Bey, 610 A.2d 814 (N.J. 1992).

In the course of the state's preparation for Bey's retrial in 1988, an investigator from the Monmouth County Prosecutor's Office interviewed some 12 or 13 corrections officers regarding Bey. He discovered that, in addition to the earlier confession to the police, Bey had made statements to Pearson while incarcerated in late 1983 and early 1984 at the Capital Sentencing Unit ("CSU") of the New Jersey State Prison in Trenton. In a statement taken September 19, 1988, Pearson told the investigator that shortly after Bey's arrival at the CSU he had "talked" with

3

Bey about "why he was here" and "why he did it." Bey had disclosed to him that he killed two women, one of whom he "raped and beat" "on the beach," and that he was "high" while committing the murders.

Bey subsequently challenged the admissibility of Pearson's proposed testimony on Sixth Amendment grounds and a suppression hearing was held.1 At the hearing, Bey denied ever discussing the murders with Pearson, but Pearson reiterated the statements he had made to the investigator. Pearson also stated that he had never initiated a conversation about Bey's murders and had only discussed them when Bey brought up the subject. Pearson did, however, acknowledge asking Bey for clarification "if it was something I didn't understand." The only specific example of a question Pearson remembered asking about the murders was "I asked him why would he do that. What kind of mind you was in." Pearson also indicated that he was aware that Bey had an appeal pending and that he was represented by counsel.

At the close of the suppression hearing, the court found that the structure of the CSU was such that the prisoners, as a practical matter, could not converse with one another. Thus, conversations could be conducted only with the guards. As a corrections officer on the CSU, Pearson was charged with the responsibility of keeping Bey in custody and safe. His responsibilities, according to the court, included talking to and observing Bey to detect any suicidal tendencies. The court also observed that the dialogue between Bey and Pearson "touched a whole host of topics,"

including sports, women, and "life in jail," but that on five to seven occasions "there was a discussion" about why Bey was incarcerated. The only question mentioned by the trial court was characterized as Pearson's having asked, "Why did it happen?" The response, according to the court, was "drugs or alcohol." The trial judge found that Pearson "never set out to gain information from Mr. Bey in the capacity of being a corrections officer; that they were

_____

1. Bey's motion to suppress his confession relied on both the Fifth and Sixth Amendments. Before us, he relies exclusively on the Sixth Amendment.

4

talking, as he described it, man to man," and that "[i]t was the inmate who initiated the conversations." Furthermore, the court noted that Pearson made no report of his conversations with Bey prior to being interrogated five years after they occurred. Pearson's testimony was "found to be extremely credible, although reluctantly given."

The trial judge concluded that the Miranda rule2 was not violated, that there was nothing about the setting that was coercive, and that Bey's statements were entirely voluntary. While the isolation in the unit could fairly be described as involving pressure to converse with a guard, there was no physical or psychological pressure to converse about incriminating subject matters. The trial judge observed that the conversations between the men "had nothing to do ... with whether or not the Court ultimately was going to overturn the conviction." The court ultimately ruled that Pearson's testimony would be allowed into evidence.

At Bey's second trial, Pearson testified only that Bey told him that "he had beat [sic] and raped a woman on the beach" and that she "died." The jury did not hear from Pearson any information about drugs, alcohol, or any other motivation for the crime.

The prosecution supplemented Bey's confession by offering the testimony of investigators from the prosecutor's offices of two other New Jersey oceanfront counties. The investigators confirmed that there had been no homicides of females in the vicinity of the beaches in either county between the defendant's return to New Jersey in March of 19833 and his arrest in May of that year; the prosecution used this evidence to link Bey's statement that he had "beat and raped a woman on the beach" to Cheryl Alston's death, arguing that Bey's statement could refer to no other murder. The other evidence included: (1) police testimony

and photographs describing the crime scene in which Alston's naked body had been found in a vacant lot across the boardwalk from the beach along with a "two-by-four,"

_____

2. See Miranda v. Arizona, 384 U.S. 436 (1966).

3. In order to prevent the jury from hearing that Bey had been incarcerated and was paroled on March 19, 1983, the parties stipulated that he "resided" outside of the state of New Jersey prior to that date.

which had on it blood and hair later determined to match those of the victim; (2) testimony by the medical examiner that Alston died of blunt blows with a "two-by-four" instrument to the head, chest, and abdomen; (3) the testimony of a forensic scientist that a semen stain on the victim's discarded clothing was consistent with Bey's enzyme markings, but that spermatozoa removed from the victim's vagina was not; and (4) the testimony of another forensic scientist that the single set of footprints in the sand next to the body were the same "size," "pattern," and "make" as a pair of sneakers seized at the time of Bey's arrest at his mother's house 1.7 miles from the location of the crime scene.

The jury convicted Bey once again of murder, felony murder, aggravated assault, and aggravated sexual assault. The court sentenced him to life imprisonment with a 30-year parole disqualifier for the murder count and a consecutive term of 20 years with a 10-year parole disqualifier for the aggravated sexual assault count, and imposed a $2,000 Violent Crime Compensation Board penalty. The felony murder and aggravated assault counts were merged.

On appeal, the Appellate Division of New Jersey's Superior Court disagreed with the trial court's determination that Pearson was not acting as a "law enforcement agent" during his conversations with Bey. State v. Bey, 610 A.2d 403, 411-12 (N.J. Super. Ct. App. Div. 1992). The court observed that a corrections officer is a law enforcement agent by statute in New Jersey, see N.J.S.A. 2A:154-4, that the guards were all encouraged to maintain good communication lines with the inmates as a suicide precaution, that it was hard for prisoners to communicate with one another, and that the "corrections officer was one of the few people they could have any daily contact with." Bey, 610 A.2d at 411. However, the Appellate Division held that the comments were not "deliberately elicited" by the state in violation of Bey's right to counsel.

The court observed that the conversations were not knowingly designed to circumvent the protections of the Sixth Amendment as Pearson was not instructed to obtain any incriminating information from Bey, he never

prepared any reports about the information, there was no investigative or motivational nexus between the prosecutor's office and Pearson, and the state only discovered the confession to Pearson through the investigation of the prosecutor's office. Id. at 415. The court also rejected Bey's claim that the evidence at trial had been insufficient to support his conviction. The New Jersey Supreme Court denied certification. State v. Bey, 611 A.2d 657 (N.J. 1992).

The district court denied Bey's petition for habeas relief, holding that Pearson's casual discussions with Bey were not "deliberately designed to elicit statements from the defendant that would settle the outcome of the trial one way or another," and that the sum of the evidence was sufficient to support Bey's conviction.

II. STANDARD OF REVIEW

In the briefing before us, Bey argued that we should conduct plenary review of the state court's conclusion that his Sixth Amendment right was not violated. See Miller v. Fenton, 474 U.S. 104, 115-17 (1985); Parry v. Rosemeyer, 64 F.3d 110, 113 (3d Cir. 1995), cert. denied, ___ U.S. ___, 116 S. Ct. 734 (1996). The state, on the other hand, urged us to examine the decision under the more deferential standard articulated in 28 U.S.C. S 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),4 Pub. L. No. 104-132, 110 Stat. 1214.

_____

4. Section 2254(d) now provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the
claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the

State court proceedings.

When this case was briefed, the federal courts had taken conflicting positions on whether the AEDPA's amendments were applicable in non-capital habeas corpus proceedings, like Bey's, that were pending at the time of the AEDPA's enactment. The Supreme Court has since resolved the debate, holding that the AEDPA's modifications to S 2254(d) and (e) do not apply in such circumstances. Lindh v. Murphy, ___ U.S. ___, 117 S. Ct. 2059 (1997). Accordingly, we review Bey's petition under our prior plenary standard and are not required by the AEDPA to defer to the state court's conclusion on this legal issue.5

III. RIGHT TO COUNSEL

A.

The Sixth Amendment, which is made applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." U.S. Const. amend. VI; see Estelle v. Smith, 451 U.S. 454, 470 (1981). The Amendment serves to safeguard the adversarial process by ensuring that once the right to counsel has attached the accused "need not stand alone against the State" at any "critical stage" of the aggregate proceedings against him. Id. at 470; see also United States v. Henry, 447 U.S. 264, 269 (1980). The purpose of the Sixth Amendment is to protect the "unaided layman," who "finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." United States v. Gouveia, 467 U.S. 180, 189 (1984) (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972)).

In a line of cases involving incriminating statements made to police informants, the Supreme Court has held that an individual who stands indicted of a crime is denied

_____

5. Of course, the underlying factual findings by the state court are entitled to a presumption of correctness. See 28 U.S.C. S 2254(d)(1995); Kuhlmann v. Wilson, 477 U.S. 436, 459-60 (1986); Pemberthy v. Beyer, 19 F.3d 857, 864 (3d Cir. 1994).

his right to counsel when agents of the state circumvent that right by "deliberately elicit[ing]" inculpatory statements from him in the absence of his counsel, absent a voluntary and knowing waiver. Michigan v. Harvey, 494 U.S. 344, 348-49 (1990); see also Kuhlmann v. Wilson, 477 U.S. 436, 457 (1986); Maine v. Moulton, 474 U.S. 159, 173 (1985); Henry, 447 U.S. at 270; Massiah v. United States, 377 U.S. 201, 206 (1964). The deliberate elicitation doctrine was first recognized in Massiah, where the defendant, released on bail, made numerous incriminating statements to his codefendant, who had agreed to act as a government informant and had permitted the installation of a surveillance device in his automobile. Id. The Court concluded that the protections of the Sixth Amendment apply to "indirect and surreptitious interrogations as well as those conducted in the jailhouse" and held that the defendant's confession had been "deliberately elicited" by the police in violation of both the Fifth and Sixth Amendments. Id.

In Henry, the Court determined that the defendant's pretrial confession to a government informant who had been placed in the defendant's cell in order to listen to his comments should have been suppressed. 447 U.S. at 274. The Court applied Massiah's deliberate elicitation formulation, observing three relevant factors: (1) the paid informant was acting under the state's instructions and had an incentive to produce useful information; (2) the informant was ostensibly no more than a fellow inmate; and (3) the defendant was in custody and under indictment. Id. at 270. Despite the government's specific instructions to merely listen to the defendant, the informant had "stimulated" conversations with the defendant. Id. at 273. The Court held that"[b]y intentionally creating a situation likely to induce[the defendant] to make incriminating statements without the assistance of counsel, the Government violated [the defendant]'s Sixth Amendment right to counsel." Id. at 274. The case was not one where " `the constable... blundered;' rather, it [was] one where the `constable' planned an impermissible interference with the right to the assistance of counsel." Id. at 275.

9

The Court also found a Sixth Amendment violation where the confession was obtained by an informant who agreed to wear a recording device in a meeting with a defendant out on bail. Moulton, 474 U.S. at 180. The Court invoked Massiah and Henry and articulated the following principle:

> [K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

Moulton, 474 U.S. at 176. Where the police suggested that the informant wear the wire at the meeting with his codefendant and the police were aware that the meeting was for the "express purpose" of discussing the pending charges and trial defense, a Sixth Amendment violation occurred. Id. at 176-77.

In Kuhlmann, on the other hand, the Court did not find a Sixth Amendment violation where an inmate had followed police instructions and had merely listened to the confession of his cellmate. 477 U.S. at 456. After the defendant's arraignment, the police placed him in the same cell with the informant for the express purpose of determining who the defendant's accomplices were. The defendant initially told the informant the same story he had given to the police, whereupon the informant advised him that his story "didn't sound too good." Later, the defendant related the actual events, an account which the informant surreptitiously noted in writing and rendered to the police. Id. at 440. The Court cited the Massiah and Henry decisions and observed that the "primary concern of the Massiah line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." Id. at 459. The Court stated:

> Since "the Sixth Amendment is not violated whenever-- by luck or happenstance--the State obtains

> incriminating statements from the accused after the right to counsel has attached," a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

Id. at 459 (citation omitted). Because the informant had not asked any questions but "only listened" to the defendant's "spontaneous" and "unsolicited" statements, no Sixth Amendment violation occurred. Id. at 460.

In each case, those charged with Sixth Amendment violations were conducting, or working with others who were conducting, an investigation of crimes the defendant had been charged with committing. They were thus deliberately seeking to elicit information to be used in connection with the charges pending against the accused, the subject matter of the defendant's attorney-client relationship. In this line of cases, the Court struggled with the issue of whether there are any circumstances under which the state can deliberately undertake to secure incriminating information from a represented defendant in the absence of counsel and can thereafter use in court the incriminating information it obtains. The answer that has evolved is that it can, only if there is not "elicitation"--only if the government does no more than listen. See Kuhlmann, 477 U.S. at 459. It cannot if the police or their informants question or otherwise encourage or facilitate the defendant's discussion of the crime, and this is true even if the defendant initiates the discussion of the criminal conduct. See Henry, 447 U.S. at 271-72.

These strict rules are necessary in Massiah-type situations because the state has deliberately set out to secure information for use in a pending prosecution and because the accused, thinking he is communicating with a fellow inmate rather than a state investigator, is exercising no judgment as to whether counsel's advice should be sought. Under these circumstances, the risk of "dilut[ing] the protection afforded by the right to counsel" is great.

11

Moulton, 474 U.S. at 171; see Henry, 447 U.S. at 273 ("Conversation stimulated in such circumstances may elicit information that an accused would not intentionally reveal to persons known to be Government agents.").

B.

Bey also relies on another line of cases, those involving court-ordered examinations to obtain information relevant to the prosecution of the defendant's case. See Powell v. Texas, 492 U.S. 680 (1989); Satterwhite v. Texas, 486 U.S. 249 (1988); Buchanan v. Kentucky, 483 U.S. 402 (1987); Estelle v. Smith, 451 U.S. 454 (1981). In Estelle, the Court held that a defendant in a capital case has "a Sixth Amendment right to the assistance of counsel before

submitting to [a] pretrial psychiatric interview" ordered by the court for the purpose of securing information for use in connection with the defendant's trial. Id. at 469.6 It followed that, if counsel was not notified of the interview and given the opportunity to advise his client on whether to submit to it, information secured from the defendant could not be used by the state at trial. Since the state had used the psychiatrist to prove future dangerousness at the penalty stage, the death penalty judgment had to be reversed. Id. at 471. Accord Powell, 492 at 681-85 (finding violation of Sixth Amendment where defense counsel was not informed that competency and insanity examination would include issue of future dangerousness); Satterwhite, 486 at 252-55 (holding defense counsel does not receive constructive notice of a mental examination and its scope through the filing of documents granting an ex parte motion for such an exam). Compare Buchanan, 483 at 424-25 (where defense counsel had raised mental status defense and had moved for a psychiatric examination, no Sixth Amendment violation occurred when court-ordered examination was used at trial to rebut the defense).

_____

6. In Estelle, the purpose of the interview was to determine competence to stand trial, 451 U.S. at 456-57, whereas in Powell, it was for that purpose and to determine sanity at the time of the offense. 492 U.S. at 681. The motivation for the evaluation in Satterwhite included both competency for trial and sanity at the time of the crime as well as future dangerousness. 486 U.S. at 252.

In the Estelle line of cases, as in Massiah, those acting on behalf of the state, i.e., the prosecutor, judge, and psychiatrist, were deliberately attempting to secure information from the defendant for use in connection with his prosecution. Accordingly, a similar risk of diluting the protection afforded by the Sixth Amendment existed in this line of cases.

C.

The critical distinction between this case and the Massiah and Estelle lines is that Pearson, while a state actor, was not a state actor deliberately engaged in trying to secure information from the defendant for use in connection with the prosecution that was the subject matter of counsel's representation. While it may be debatable whether any of the information used at trial was given by Bey in response to a question from Pearson, the state court found, based on undisputed facts, that no question asked by Pearson was part of an effort

"deliberately designed to elicit incriminating remarks" for use against Bey. While it thus may not be clear whether there was an "elicitation" by Pearson, there certainly was no "deliberate elicitation" within the teachings of the cases Bey relies upon.

Ordinarily, when a state agent converses with an indicted defendant under circumstances in which the agent should expect that incriminating information might be disclosed and such information is disclosed and is subsequently used in the prosecution, it can be presumed that there was a deliberate elicitation of information for use in connection with the case. The undisputed facts in this case, however, are simply inconsistent with a deliberate plan on the part of Pearson to garner information for use against Bey.7

_____

7. In an appropriate case, the trial court could preclude the prosecution from admitting a corrections officer's testimony into evidence. If a corrections officer's role requires conversations with inmates under circumstances in which inculpatory statements should be foreseen, the prosecution should expect to forego, at the subsequent trial of the inmate, the use of any statements elicited in those conversations, unless the inmate has been given Miranda warnings.

Pearson was known by Bey to be an employee of the state, not a fellow inmate or confederate. While the circumstances were such that Pearson should have anticipated that Bey would converse freely with him, given Pearson's status as a guard and the fact that he did little, if anything, to draw Bey out on the subject of his crimes, we question whether Pearson should have anticipated the confession which Bey volunteered. But even if we assume elicitation on Pearson's part, the undisputed facts do not support the hypothesis that Pearson intended to elicit information for use against Bey. First, Pearson had no responsibility for eliciting or reporting information for use in the prosecution of Bey's case and was not working with anyone who had such responsibility. Second, and most importantly, Pearson did not behave like someone who intended to secure incriminating statements from Bey. The record lacks evidence of any questions designed to elicit the statement that Bey had raped and beaten a woman to death on the beach, and merely reveals Pearson's asking "why" Bey had committed the act and seeking clarification "if it was something [he] didn't understand." Pearson did not take any notes or compile any reports of his conversations with Bey. Cf. Kuhlmann, 477 U.S. at 440 (informant surreptitiously recorded cellmate's statements in writing). In fact, Pearson disclosed the confession to no one

for five years.[8] It was only through the systematic efforts of the investigator that the prosecutor's office uncovered Bey's statements. Even Pearson's testimony in Bey's case was "reluctantly given." Thus, the state's receipt of Bey's

_____

8. In this regard, we think Bey's case is similar to that of the jailhouse informant in United States v. York, 933 F.2d 1343, 1360 (7th Cir. 1990). The informant in York did not report to the FBI the information he had obtained through casual conversations with the defendant until several months after the discussions had occurred when he learned from a newspaper account that the defendant's conviction had been reversed. The Seventh Circuit observed that "[i]t is inconceivable that had these statements been the fruit of an attempt to deliberately elicit information from [the defendant] that [the informant] would not have reported them to [his FBI contact] at that time." Id. Similarly, there is no explanation for Pearson's failure to immediately convey his information to the prosecutor's office or even his supervisor, if he intended to elicit incriminating information from Bey.

14

confession was not the result of any deliberate elicitation by Pearson for use in connection with Bey's prosecution, and the state's use of Bey's confession at trial did not violate the Sixth Amendment.[9]

IV. Sufficiency of the Evidence

We also find no merit in Bey's sufficiency of the evidence challenge. Pearson's testimony, if credited, established that Bey had "beat[en] and raped a woman on the beach" and that she had "died." Investigators from the prosecutor's offices in two New Jersey oceanfront counties confirmed that there were no homicides of females in the vicinity of the beaches in their jurisdiction during the relevant time period; this evidence narrowed the possibility that Bey was confessing to the murder of someone other than Alston when he admitted that he had beaten and raped a woman

_____

9. Of course, any evidence of an additional legitimate reason for interviewing Bey would be irrelevant were we to determine that Pearson had deliberately acted to secure information for the prosecution. See Moulton, 474 U.S. at 178-80. The Court in Moulton rejected the state's argument that there was no Sixth Amendment violation because the police had a legitimate basis for their surveillance activities which was said to validate their conduct, i.e., they listened to the conversation in order to protect the informant from future harm and to investigate other crimes. As the Court concluded, "[b]ecause we hold that the ... police knowingly circumvented [the defendant]'s right to have counsel present at a confrontation between [the defendant] and a police agent, the fact

that the police had additional reasons for recording[the defendant]'s meeting with [the informant] is irrelevant." Id. at 180.

Moulton thus instructs that the state's knowing exploitation of an opportunity to secure incriminating statements from a counseled defendant in the absence of his attorney may not be "cured" merely because the state has a right to obtain information for other purposes. Id. at 178. Such is not the issue in our case, as the government is not claiming that Pearson acted deliberately to secure the information for the investigating authorities but was justified in doing so because they also needed it, for example, in order to monitor Pearson's performance of his suicide watch. Where there is no deliberate attempt to secure prosecution information, the admission of the statements does not "invit[e] abuse by law enforcement personnel in the form of fabricated investigations;" nor does it "risk the evisceration of the Sixth Amendment right recognized in Massiah." Id. at 180.

on a beach. Alston's naked and battered body was found just across the boardwalk from the beach with her bra wrapped around her neck. She died from severe blunt trauma caused by a two-by-four inch instrument matching the stick found at the scene, bearing her blood and hair. Articles of her clothing located at the scene were stained with sperm which was consistent with Bey's enzyme markers. The single set of footprints matched the"size," "pattern," and "make" of a pair of sneakers seized at the time of Bey's arrest from his mother's house less than two miles away from the location of the body.

Taking this evidence in the light most favorable to the state, as we must, we hold that Pearson's testimony and the other evidence that corroborates and supplements it provides a satisfactory basis for the jury's beyond a reasonable doubt verdict. See Jackson v. Virginia, 443 U.S. 307, 318-19 (1979); Jackson v. Byrd, 105 F.3d 145, 147-48 (3d Cir.), cert. denied, U.S. ___, 117 S. Ct. 2442 (1997). In reaching this conclusion, we are not unmindful of the fact that the sperm found in the victim's vagina did not match Bey's enzyme type. The jury was entitled to evaluate this fact in light of the forensic scientist's uncontested testimony that sperm may remain in the body for up to 48 hours after sexual intercourse, although it is rarely discovered later than 16 hours after such activity. The jury was thus not required to conclude that this undisputed fact was inconsistent with Bey's guilt.

V. CONCLUSION

We will affirm the judgment of the district court.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

16