**AMERICAN SAMOA GOVERNMENT, Plaintiff**

**v.**

**MARLON ULI, Defendant.**

High Court of American Samoa
Trial Division

CR No. 41-03

April 13, 2004

Before KRUSE, Chief Justice, ATIULAGI, Associate Judge, and SAGAPOLUTELE, Associate Judge.

Counsel: For Plaintiff, Harvey L. Kincaid, Assistant Attorney General
For Defendant, Andrew T. Stave, Assistant Public Defender

ORDER DENYING MOTION TO SUPPRESS, DENYING MOTION
TO INSPECT VIDEO-TAPE RECORDINGS, & GRANTING
MOTION TO EXTEND TIME FOR FILING PRE-TRIAL MOTIONS

Defendant Marlon Uli ("Uli") is charged with murder in the first degree, in violation of A.S.C.A. § 46.3502(a)(1). Uli moves to suppress statements he made to officers on November 13, 2002. Uli also moves to suppress other statements he made to an officer at the Tafuna Correctional Facility ("TCF") subsequent to his arrest. Additionally, Uli moves for the disclosure of aggravating factors, the inspection of videotaped recordings of witness interviews and the crime scene, and an extension of time in which to file pre-trial motions. All counsel and Uli were present at the March 29, 2004 hearing on this matter. For the reasons stated below, we deny Uli's motion to suppress and to inspect videotaped recordings. However, we grant Uli's motion to extend the time for the filing of pre-trial motions.

## Discussion

### I. Motion to Suppress

Uli moves to suppress statements he made to officers on three separate occasions: (1) the oral and written statements he made to officers on November 13, 2002 at the central police station ("CPS") in Fagatogo ("CPS Statements"); and (2) the oral statements he made to an officer while incarcerated at TCF ("TCF Statements") on two separate occasions.

Uli argues that the statements were illegally obtained in violation of his Fifth, Sixth, and Fourteenth Amendment rights of the United States Constitution, as well as Article I, Section 6 of the Revised Constitution of American Samoa and, therefore, must be suppressed. We will discuss the CPS and TCF Statements in turn.

### A. CPS Statements

On November 13, 2002, sometime around 9:00 p.m., Uli and his father, Anaua Uli ("Anaua"), arrived at CPS. According to Uli and Anaua, they went to the station because officers had been by Anaua's house earlier that evening looking for Uli and because they wanted to recover their vehicle, which was in police custody.

Upon their arrival at CPS, Uli and his father sat together downstairs at the station. Sometime thereafter, an officer asked Uli to accompany him to a separate room. Without reading Uli his *Miranda* rights, Sgt. Lui Fuifatu ("Sgt. Fuifatu") interviewed Uli regarding the events surrounding the death of Ma`alona Felisi ("Ma`a"), which had occurred earlier that

afternoon.[1] Sgt. Fuifatu testified that he considered Uli to be a witness and that he explained this to Uli. According to Uli, the questioning lasted fifteen or twenty minutes. After the questioning, Sgt. Fuifatu asked Uli to give a written statement. Sgt. Fuifatu testified that Uli inquired whether he needed an attorney before making a written statement.[2] Sgt. Fuifatu claims he again informed Uli that they considered him a witness not a suspect at that time. Subsequently, Uli made a written statement.

The witnesses at the suppression hearing estimated the time Uli was at the station was somewhere around two hours. During this entire time, Uli was never handcuffed, threatened, placed under arrest, or told that he could not leave. Uli was allowed to smoke cigarettes in the room. After Sgt. Fuifatu requested Uli make a written statement, he left the room. A few hours later, Uli was arrested in connection with the death of Ma`a. At this time, Uli was given his warning of his rights, and he invoked them, refusing to make a statement.

Uli claims that his CPS Statements were made while in custody, during an interrogation, and without adequate advisement of his rights. Uli argues that the statements were illegally obtained and, therefore, must be suppressed. The government disagrees, arguing that there was no violation of Uli's rights because Uli was not in custody when he made the CPS Statements. We agree with the government.

■ As well established by *Miranda v. Arizona*, 384 U.S. 436 (1966), statements given by a person during custodial interrogation without a prior warning are in violation of constitutionally-protected rights and are subject to the exclusionary rule. However, in order to trigger *Miranda*, an individual must be in custody and must be subject to interrogation. A statement made by a person who was not in a custodial situation is not subject to suppression on *Miranda* grounds. *See American Samoa Gov't v. Fealofa`i*, 24 A.S.R.2d 10, 11-12 (Trial Div. 1993).

■ Custodial interrogation occurs when "questioning [is] initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. Courts look at the "totality of the circumstances" when making a determination as to whether a person is "in custody." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). However, "the ultimate inquiry is simply whether there is a formal arrest

---

[1] At some point, another officer, Mike Fuiava, was present in the room.

[2] Uli's testimony differs from Fuifatu's testimony about how and when he requested an attorney. Uli testified that he clearly requested an attorney prior to being questioned by the officers and again during the interview. We believe Fuifatu's testimony of the events to be more credible.

or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (citations omitted).

In *Oregon v. Mathiason*, 429 U.S. 492 (1977), the Supreme Court found that a suspect who voluntarily went to a police station and freely left after a thirty-minute interview was not "in custody" for *Miranda* purposes. The Court explained that "[*Miranda*] warnings [are not] to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Id.* at 495. Likewise, in *Beheler*, the Court found the defendant was not "in custody" when he voluntarily accompanied the police to the police station, was interviewed for about thirty minutes, and was then allowed to leave. 463 U.S. at 1122-23. The Court noted that "Beheler was neither taken into custody nor significantly deprived of his freedom of action. Indeed, Beheler's freedom was not restricted in any way whatsoever." *Id.* at 1123.

In the current case, based on the aforementioned facts adduced at the suppression hearing, we find that Uli was not in custody at the time he made his statements to the officers. *See, e.g., Fealofai`i*, 24 A.S.R.2d at 11-12; *People v. Gillis*, 632 N.Y.S.2d 671 (N.Y. App. Div. 1995) (finding defendant's twelve-hour interrogation was non-custodial when the defendant "voluntarily came to the police station and agreed to go with the State Police to their barracks; he was not handcuffed or physically restrained and was repeatedly left unguarded. The atmosphere in the interview room was not coercive and the questioning was investigatory, not accusatory or continuous; defendant was fed and allowed to sleep alone in the unlocked interview room"). Accordingly, Uli's CPS Statements are admissible.[3]

## B. TCF Statements

On two separate occasions while incarcerated at TCF, Uli made statements to Filemoni Amituana`i ("Amituana`i"). Amituana`i was an officer at TCF[4] who was assigned to transport prisoners from TCF to the hospital for medical appointments and to the court. He also had duties

---

[3] To the extent Uli is arguing that his CPS Statements should be suppressed because they were given in violation of his Sixth Amendment right to counsel, he is incorrect. The Sixth Amendment right to an attorney attaches "at or after the initiation of adversary judicial criminal proceedings-- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Ill.*, 406 U.S. 682, 689 (1972); *see also Fellers v. U.S.*, 124 S.Ct. 1019, 1022 (2004). Accordingly, at the time of the CPS Statements, Uli's Sixth Amendment right to counsel had not attached.

[4] Amituana`i has been reassigned and is no longer working at TCF.

during food service. Amituana`i was never directed to interrogate or question Uli but, rather, testified that he frequently had casual conversations with Uli and other prisoners while employed at TCF. Amituana`i testified that TCF has rooms for interrogation, but that the two conversations at issue with Uli occurred outside of these rooms.

According to Amituana`i the first conversation at issue occurred while he was supervising food service in the maximum unit. Amituana`i asked Uli if the victim, Ma`a, in his case was the same Ma`a who Amituana`i knew. Uli affirmatively replied and then, without any further prompting by Amituana`i, made several inculpatory statements to Amituana`i.

The second conversation at issue occurred when Uli approached Amituana`i to inquire about his next court date. Amituana`i replied that he would let Uli know his next court date when he received the schedule. Then, Amituana`i proceeded to ask Uli how his case was going. Uli replied with several potentially inculpatory statements.

Uli argues that these TCF Statements should be suppressed. In response, the government argues that the TCF Statements were not given in violation of either the Fifth or Sixth Amendment. The government claims that Uli was not subject to interrogation and, therefore, his statements should not be suppressed under the Fifth Amendment. The government also argues that the statements should not be suppressed under the Sixth Amendment because Amituana`i did not "deliberately elicit" the statements from Uli. The government does not dispute that Uli's Sixth Amendment right to counsel had attached at the time these statements were made to Amituana`i. We agree with the government.

■ As discussed above, in order to trigger the protections of *Miranda*, an individual must be in custody and must be subject to interrogation. *See* discussion *supra* at 88. The government does not dispute that Uli was in custody at the time he made the TCF Statements. However, there is disagreement among the courts about whether a defendant is automatically "in custody" simply because he is incarcerated. Indeed, the Fourth Circuit has held that "a prison inmate is not automatically always in 'custody' within the meaning of *Miranda*." *U.S. v. Cooper*, 800 F.2d 412, 414 (4th Cir. 1986) (*quoting U.S. v. Conley*, 779 F.2d 970, 972 (4th Cir. 1985)). Rather, "custody" in the prison context, "necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement." *Id.* (citations omitted); *see also American Samoa Gov't v. Galumalemaga*, CR No. 98-00, Order denying Motions to Suppress at 4-6 (Trial Div. Feb. 14, 2001) (defendant was not in custody for *Miranda* purposes when he was subjected to on-the-scene questioning at TCF); *U.S. v. Menzer*, 29 F.3d 1223, 1231-32 (7th Cir. 1994). One commentator noted,

On a superficial review, all incarceration might seem to constitute custody since inmates cannot, of course, leave the facility in which they are incarcerated. But custody in layperson's terms is not necessarily custody for Miranda purposes. Miranda's definition of custody reflects a concern more with the coercive forces that may affect interactions between a suspect and an interrogating official, and less with the fact that a person's ability to select his activities and routine is greatly limited as an inmate. Thus, many courts have convincingly made a distinction between custody for Miranda purposes and general prison population confinement.

Laurie Magid, *Questioning the Question-Proof Inmate: Defining Miranda Custody for Incarcerated Suspects*, 58 OHIO ST. L.J. 883, 933 (1997).

The two conversations at issue were between Uli and a junior corrections officer. One conversation occurred in the lunch room. Neither conversation was conducted in any sort of interrogation room. Uli was not restrained in any additional manner. Both conversations were brief. Uli's answers to both questions from Amituana`i went well beyond the scope of the questions. Under these facts, we do not believe that Uli was "in custody" for *Miranda* purposes.

Although we could end our inquiry here, we also do not believe Uli was interrogated by Amituana`i. In *Rhode Island v. Innis*, 446 U.S. 297 (1980), the United States Supreme Court specifically addressed the meaning of "interrogation" in the *Miranda* context. The Court noted that,

> the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

*Id.* at 308 (footnotes omitted). Amituana`i testified that he did not intend to conduct an investigation. His purpose was to engage in casual conversation and to satisfy his own curiosity. Uli's answers to both questions went well beyond the scope of Amituana`i's innocuous inquiries.

Uli's "gratuitous, expletive, and candid reply to the query cannot be characterized as one induced by any form of proscribed intimidation. At best the question and the answer were the products of [n]ormal, human,

131

and spontaneous curiosity." *State v. Davis*, 157 N.W.2d 907, 911 (Iowa 1968) (quoting *State v. Persinger*, 433 P.2d 867, 868 (Wash. 1967)). In this case, we do not believe the questions posed (or the manner in which they were posed) by Amituana`i created the sort of custodial interrogation contemplated by the *Miranda* court.[5] *See, e.g., People v. Taylor*, 766 N.Y.S.2d 266, 268 (N.Y. App. NY 2003) ("Finding that [the detective's] communications were not intended or anticipated to evoke inculpatory declarations, we reiterate the established principle that the police are not required to silence [a] chatterbox.") (citations omitted, alteration in original); *People v. Johnson*, 30 P.3d 718, 724 (Colo. Ct. App. 2000) ("[C]onsidering the totality of the circumstances, the challenged statements were not the product of an interrogation because they were not elicited by words or actions that the officer should have known were reasonably likely to elicit an incriminating response. Further, the encounter was brief and was entirely devoid of the inherently coercive interrogation practices that *Miranda* and its progeny traditionally have sought to address.") (citations omitted). As such, we will not suppress the TCF Statements under the Fifth Amendment.

■ Since we find that the TCF Statements should not be suppressed under the Fifth Amendment, we now turn to the question of whether the statements should be suppressed under the Sixth Amendment. The United States Supreme Court recently said "that an accused is denied 'the basic protections' of the Sixth Amendment 'when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel.'" *Fellers*, 124 S.Ct. at 1022 (quoting *Massiah v. United States*, 377 U.S. 201, 206 (1964)) (alterations in original). Therefore, we must determine whether Amituana`i "deliberately elicited" the TCF Statements from Uli in violation of the Sixth Amendment.

In *Bey v. Morton*, 124 F.3d 524 (3rd Cir. 1997), the defendant moved to suppress under the Sixth Amendment incriminating statements he made to a corrections officer while incarcerated. *Id.* at 527. The corrections officer testified that he had several conversations with the defendant and that during some of these conversations the defendant relayed information about the crimes. *Id.* at 526. The trial judge found that the corrections officer "never set out to gain information from [the defendant] in the capacity of being a corrections officer; that they were talking, as he described it, man to man." *Id.*

---

[5] Although we do not find that Amituana`i interrogated Uli as contemplated under *Miranda* and *Innis*, we do not encourage officers to engage in these sorts of conversations with the inmates at TCF.

In distinguishing *Bey* from *Massiah* and its progeny, the *Bey* court noted that "[t]he critical distinction . . . is that [the corrections officer], while a state actor, was not a state actor deliberately engaged in trying to secure information from the defendant for use in connection with the prosecution that was the subject matter of counsel's representation." *Id.* at 531. In making its determination the *Bey* court further noted,

> [The corrections officer] was known by Bey to be an employee of the state, not a fellow inmate or confederate. While the circumstances were such that [the corrections officer] should have anticipated that Bey would converse freely with him, given [the corrections officer's] status as a guard and the fact that he did little, if anything, to draw Bey out on the subject of his crimes, we question whether [the corrections officer] should have anticipated the confession which Bey volunteered. But even if we assume elicitation on [the corrections officer's] part, the undisputed facts do not support the hypothesis that [the corrections officer] intended to elicit information for use against Bey. First, [the corrections officer] had no responsibility for eliciting or reporting information for use in the prosecution of Bey's case and was not working with anyone who had such responsibility. Second, and most importantly, [the corrections officer] did not behave like someone who intended to secure incriminating statements from Bey.

*Id.* We believe Amituana`i's conversations with Uli are similar to those between the corrections officer and the defendant in *Bey*. Amituana`i testified that he was not directed to question Uli, that he frequently has conversations with inmates at TCF, and that he asked Uli the question about Ma`a to satisfy his own curiosity. Amituana`i testified that he did not write down Uli's statements from the first conversation immediately, and that he did not tell detectives about this conversation until after Uli's first case had been dismissed.[6] Moreover, Uli made statements Amituana`i could not have anticipated Uli would make in response to the two questions he asked. Under these specific circumstances, Amituana`i was not "deliberately eliciting" incriminating information from Uli to later use against him. Thus, we decline to suppress Uli's statements under the Sixth Amendment.

## II. Motion to Disclose Aggravating Factors

Uli seeks an order requiring the government to disclose any aggravating factors it may use at his trial in the event the government seeks the death

---

[6] *See American Samoa Gov't. v. Uli*, CR No. 71-02 (Trial Div. 2003).

penalty. In response, the government stated at hearing that it does not intend to seek the death penalty. As such, Uli's counsel agreed at the hearing that this motion is unnecessary.

## III. Motion to Inspect Videotaped Recordings

Uli seeks to inspect videotaped recordings that are currently in the possession of the government. These recordings are of witness interviews as well as of the crime scene. The government counters that if it plans to enter the scene reconstruction video into evidence, it will give defense counsel a copy. The government also acknowledged its ongoing duty to turn over any *Brady* material to defense counsel. *See Brady v. Maryland,* 373 U.S. 83 (1963).

We are satisfied that the government is well aware of its duty to turn over *Brady* material to defense counsel. In addition, with respect to the videotape of the scene reconstruction, we assume, and expect, that the government will be true to its in-court representation and will give defense counsel a copy of the videotape if it intends to use it as evidence at trial.

With respect to the videotape of potential witness statements, we reiterate that we expect the government to comply with its obligations under *Brady*. However, absent *Brady* material, we will not order the pre-trial production of this videotape. T.C.R.Cr.P. 16(a)(2) ("[T]his rule does not authorize the discovery . . . of statements made by government witnesses or prospective government witnesses."). We do note that the government's position at the hearing was unclear on whether or not the videotapes contain *Brady* material. Accordingly, we order the government to respond in writing to Uli's request for *Brady* material from the videotapes. If, indeed, the government contends that the videotapes do not contain *Brady* material, Uli may renew his motion for an *in camera* review of the videotapes, and we will consider at that time whether an *in camera* review is appropriate. *See, e.g., State v. Craft,* 776 N.E.2d 546, 549-50 (Ohio Ct. App. 2002); *State v. Marco,* 577 So.2d 328, 329-330 (La. Ct. App. 1991). In the meantime, we remind the parties that "[a]s a matter of policy, this court encourages opposing counsel to cooperate with one another, whenever possible, to facilitate fair and orderly criminal proceedings." *American Samoa Gov't v. Solaita,* 27 A.S.R.2d 9, 15 (Trial Div. 1994).

## IV. Motion to Extend Time

Uli requests an extension of time in order to file additional pre-trial motions. We grant this motion.

## Order

The motion to suppress Uli's CPS and TCF Statements is denied. Uli's motion to inspect videotaped recordings is denied; however, the government should respond to Uli in writing and address whether the videotapes contain *Brady* material. Uli's motion to extend time for the filing of pre-trial motions is granted.

It is so ordered.

