**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 08-9000

———————

DANIEL M. SARANCHAK,

Appellee

v.

JEFFREY BEARD, Commissioner, Pennsylvania Department
of Corrections; DAVID DIGUGLIELMO, Superintendent of
the State Correctional Institution at Graterford; FRANK
TENNIS, Superintendent
of the State Correctional Institution at Rockview;
ATTORNEY GENERAL OF PENNSYLVANIA;
SCHUYLKILL COUNTY DISTRICT ATTORNEY,

Appellants

———————

On Appeal from the United States District Court
for the Middle District of Pennsylvania
District Court No. 05-cv-00317
District Judge: The Honorable Sylvia H. Rambo

———————

Argued October 14, 2009

Before: SLOVITER, SCIRICA, and SMITH, *Circuit Judges*

(Filed: August 3, 2010)

Matthew C. Lawry
Stuart B. Lev
Shawn Nolan (*Argued*)
Defender Association of Philadelphia
Federal Capital Habeas Corpus Unit
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA 19106
        *Counsel for Appellee*


James P. Barker (*Argued*)
Jennifer A. Buck
Office of Attorney General of Pennsylvania
Appeals & Legal Services
Strawberry Square
16th Floor
Harrisburg, PA 17120

Stuart Suss
234 Yorkminister Road
West Chester, PA 19382
        *Counsel for Appellant*s

OPINION

SMITH, *Circuit Judge*.

After fatally shooting his grandmother and uncle, Daniel Saranchak ("Saranchak") was quickly arrested and later convicted of first degree murder in the Court of Common Pleas of Schuylkill County, Pennsylvania. He was then sentenced to death. Saranchak took a direct appeal to the Pennsylvania Supreme Court, which affirmed the conviction and sentence. After being denied collateral relief in the Pennsylvania state court system, he sought a writ of habeas corpus in the federal system. The District Court granted his petition in part, reaching issues related only to the guilt phase of his trial. The Commonwealth appeals.[1] For the reasons expressed below, we will reverse.

---

[1] Defendants/Appellants are Jeffrey Beard, Commissioner of the Pennsylvania Department of Corrections; David DiGuglielmo, Superintendent of the State Correctional Institution at Graterford; and Frank Tennis, Superintendent at the State Correctional Institution at Rockview; the Attorney General of Pennsylvania; and the District Attorney for Schuylkill County. We refer to them collectively as "the Commonwealth."

I.

The facts of the underlying crimes have been extensively set forth by several courts during the course of a lengthy collateral review process. We recount them below because they are critical to an understanding of our resolution of the petitioner's attack on the guilt phase of his trial. Daniel Saranchak lived in an apartment above Mickey Courtney's Sportsmen Bar ("Courtney's Bar") in Pottsville, Pennsylvania. At about 3:00 p.m. on October 15, 1993, Saranchak and his neighbor Julian Spirko ("Spirko") illegally dumped garbage on a mountain near Courtney's Bar, performing the task as a favor to the bar's owner. On their way home, Saranchak and Spirko stopped by the home shared by Saranchak's grandmother Stella Saranchok ("Stella")[2] and uncle Edmund Saranchak ("Edmund"), where Saranchak consumed several bottles of beer. Saranchak and Spirko returned to their respective apartments at about 5:00 p.m. At about 7:00 p.m., Saranchak met James Steiner ("Steiner"), another neighbor, to collect discarded furniture from a nearby apartment and haul it to a dumping area. After unloading the furniture, the two went to a bar and consumed three to four drinks each. When they left the bar, they drove to a cemetery so that Saranchak could visit his father's grave. Standing at the grave, Saranchak could be seen speaking in the direction of the headstone for five to ten minutes.

---

[2] Saranchak's grandmother Stella spelled her surname differently than her son Edmund and her grandson, the Appellee.

4

Saranchak and Steiner proceeded to a friend's house, where Saranchak consumed another drink, eventually ending up at Courtney's Bar sometime after 8:00 p.m. Around this time, Spirko entered the bar and again saw Saranchak. Both Steiner and Spirko noticed that Saranchak was visibly intoxicated. Steiner later described Saranchak as "more aggressive" and also "[g]iggling and talking strange stuff."

At Courtney's Bar, Saranchak spent time conversing with his friend Roy Miles ("Miles"). Saranchak asked Miles if he knew where they could get some money, but Miles answered that he did not. Saranchak then replied that he knew of a source, but that it might be necessary to shoot someone. After consuming several more drinks, the pair left the bar at 11:30 p.m. With Saranchak driving, they stopped at a store and purchased beer. Having consumed several more drinks, Saranchak and Miles stopped at the house of Saranchak's stepfather and brother to obtain a rifle. Leaving the house with a .22 caliber rifle in hand, Saranchak encountered his wife and his brother outside. The two tried to persuade Saranchak not to leave with the rifle, but were unsuccessful. Saranchak said he was going hunting and asked his brother to come along. When his brother declined the invitation, Saranchak drove with Miles to another bar and purchased two quarts of beer.

Having consumed more beer, Saranchak next drove the pair to his grandmother's house. Saranchak told Miles that he was going inside to get some money from his grandmother.

5

Miles accompanied Saranchak, who was carrying the rifle, through an unlocked basement door. There, they saw Saranchak's uncle Edmund asleep on a couch in the basement. Saranchak walked directly to the sofa and shot his uncle in the center of his forehead, killing him instantly. Saranchak rolled the body over while Miles went through the victim's pockets. They took his wallet, which contained a sum of cash, and then went upstairs to Stella Saranchok's second floor bedroom where they found her sleeping. Saranchak asked Miles to shoot his grandmother, but Miles refused. Awakened, Stella called out: "Danny, is that you? It's getting late. You can go downstairs if you want." At this point, Saranchak shot his grandmother once in the center of her forehead. The two men then lowered the blinds and searched the room for money. Saranchak located a safe, but was unable to open it. He and Miles then found Stella Saranchok's purse, and stole money from it. Saranchak next went downstairs, ate some candy, and petted his dog, which lived at the house. After saying that he was hungry, Saranchak looked for food in the refrigerator. Finally, before leaving the residence, Saranchak and Miles searched for the shell casing in the basement but were unable to find it.

With Saranchak driving, the pair returned to Courtney's Bar at about 1:00 a.m. on October 16 and remained there until it closed. They consumed several drinks at the bar, and then more at the owner's apartment upstairs. At about 4:00 a.m., Saranchak and Miles left Courtney's Bar. Saranchak drove them to a nearby diner where they ate breakfast and eventually

6

parted ways.

Edmund Saranchak had scheduled a breakfast meeting with his employer for that morning. When Edmund failed to show up, the employer went to his home and spoke to a neighbor. The employer and neighbor entered the house through the basement, where they discovered Edmund's body. They called a neighbor who was a nurse, and she confirmed that Edmund was dead. Shortly thereafter, they found Stella's body upstairs. Following a call to 911, an ambulance and paramedic responded, as did Pennsylvania State Police officers, who began photographing the crime scene and collecting physical evidence. Responders located a shell casing underneath Edmund's body. Police also canvassed the neighborhood and learned that Saranchak had stated the night before that he was going shooting. The officers obtained a warrant and seized a .22 caliber rifle from Saranchak's apartment. The Pennsylvania State Police Laboratory later matched the shell casing found under Edmund's body to the rifle seized from Saranchak's apartment. In the evening hours of October 16, state troopers located Saranchak at Courtney's Bar and arrested him. Although his eyes were glassy and he had obviously been drinking heavily, Saranchak was coherent when arrested.

The State Police advised Saranchak of his *Miranda* rights when they placed him in the police car and again when they arrived at the State Police Barracks at 9:00 p.m. During the interrogation that ensued, Saranchak gave a statement admitting

7

to illegally dumping trash for the owner of Courtney's Bar. The statement contained no reference to the murders. Corporal Reynold O. Wagner of the Pennsylvania State Police testified that, upon further questioning, Saranchak's posture became rigid and militaristic. Saranchak acted as if the officers questioning him were drill sergeants, responding to their questions with formal "Yes, Sir" or "No, Sir" answers. He soon admitted that he had been present at Stella's house, but then rebuffed the officers' follow-up questions by explaining that he was part of a classified military mission. After further questioning, he characterized the scene at Stella's house as "not a pretty sight." Saranchak eventually admitted to the state trooper interrogating him that he had shot Edmund. He described the shooting in detail, but refused to answer any questions about Stella's death, maintaining firmly that such information was classified.

Saranchak was incarcerated pending trial. While held at the Schuylkill County Prison, Saranchak met on occasion with caseworkers from Schuylkill County Children and Youth Services ("CYS") regarding his three minor children. Laurie Garber was one such caseworker who was assigned to oversee the welfare of Saranchak's children. Prior to a hearing in the CYS matter, Garber met with Saranchak to explain to him the purpose of the hearing and to answer Saranchak's questions.

She visited him again after the hearing had been conducted. This meeting lasted approximately 45 minutes. For the first 15 minutes, Garber and Saranchak discussed his

8

children and matters regarding court hearings and visitation. Garber told him that letters to his children could be sent to CYS, which would review them and then forward them to the children. Saranchak stated that he would not include anything in the letters that could be harmful for his children to read, but that he would simply explain that he had done something bad and would be in jail for a very long time. Garber then stated that neither she nor a CYS worker previously assigned to Saranchak's children's case could understand how the murders happened. At this point, Saranchak explained to Garber the nature of both killings. He admitted that he killed Edmund because of Edmund's greed and because he talked down to Saranchak. Saranchak said that his uncle "had married a whore" and that their children had received a portion of an inheritance that rightfully should have gone to Saranchak and his siblings. Saranchak admitted that he had consumed a few beers by the time he shot Edmund, but said that he was not intoxicated. According to Saranchak, he just "snapped."

Saranchak also admitted to Garber that he shot Stella. When Garber inquired why he told the judge presiding over the CYS matter that he would plead not guilty to the criminal charges, Saranchak explained that he was willing to serve time for the murders but not for other offenses because he did not steal anything. Saranchak emphasized that Edmund's greed drove him to kill his uncle and he also conveyed the impression that he believed he did Stella a favor in killing her because she was very sick. Garber later testified at the degree of guilt

9

hearing that Saranchak was very matter of fact in his description of the killing of Edmund.

Saranchak was represented in the criminal proceedings by Kent Watkins, Esq. Watkins requested the state trial court to appoint a mental health expert to examine Saranchak as to his ability to assist in his own defense, his competency to stand trial, and issues relating to his diminished capacity to form the specific intent to kill. The court granted the motion in part, appointing Dr. Stefan P. Kruszewski, a psychiatrist, to examine Saranchak and render an opinion regarding his ability to assist in his defense, his competency to stand trial, and whether statements given to the police were voluntary or involuntary as the result of any psychiatric dysfunction. The court did not, however, order Dr. Kruszewski to examine Saranchak regarding diminished capacity, nor did Watkins ever renew a request for such an examination. Dr. Kruszewski found Saranchak competent to stand trial. Watkins later testified that he never sought a second evaluation regarding diminished capacity because he concluded that Dr. Kruszewski's report contained nothing to indicate that a diminished capacity exam would be fruitful.

Saranchak eventually entered an open plea of guilty to murder generally. Under Pennsylvania criminal procedure rules, Saranchak was permitted to plead guilty generally to the murder of Edmund and Stella, and could then contest his degree of guilt during a trial limited to that issue. Pa. R. Crim. P. 803(A). The

10

non-jury degree of guilt hearing was held before Judge Cyrus Palmer Dolbin of the Court of Common Pleas of Schuylkill County, Pennsylvania and consolidated with a non-jury trial on the merits of the burglary, aggravated assault, robbery, theft, and conspiracy charges filed in connection with the murders. That proceeding took place in early September of 1996.

The Commonwealth's case in chief included the evidence recounted above. Saranchak asserted a diminished capacity defense to the murder charges, but Watkins presented no expert testimony on this issue. Rather, he relied on the testimony of Saranchak's family, friends, and neighbors to establish that the defendant consumed a considerable amount of alcohol on the night of the murders and that his conduct was so outside the ordinary that it demonstrated his diminished capacity to form the specific intent to kill.

Judge Dolbin found that Saranchak had premeditated and deliberated the killings of Edmund and Stella, and entered verdicts of guilty on both counts of first degree murder. He also found Saranchak guilty of burglary, aggravated assault, robbery, theft, and conspiracy. A jury was empaneled for the sentencing phase of Saranchak's criminal trial and returned a sentence of death.[3]

---

[3] At the sentencing phase of the proceedings, the jury found two aggravating factors and no mitigating factors. The sentence of death was thus mandatory. 42 Pa. Cons. Stat. § 9711(c)(1)(iv)

11

The judgment was affirmed on direct appeal by the Pennsylvania Supreme Court. *Commonwealth v. Saranchak*, 675 A.2d 268 (Pa. 1996). Saranchak petitioned the Supreme Court of the United States for a writ of certiorari, which was denied. *Saranchak v. Pennsylvania*, 519 U.S. 1061 (1997) (Mem.). He then filed a *pro se* petition under Pennsylvania's Post-Conviction Relief Act, 42 Pa. Cons. Stat. §§ 9541–9546 ("the PCRA"). Judge Dolbin, the same judge who held the degree of guilt hearing and non-jury trial, appointed new counsel to represent Saranchak, but later denied the petition. Saranchak appealed. His present counsel assumed representation in the PCRA matter after docketing but prior to briefing. The Pennsylvania Supreme Court vacated the denial of the PCRA petition and remanded with instructions to permit Saranchak to file an amended PCRA petition. *Commonwealth v. Saranchak*, 739 A.2d 162 (Pa. 1999).

After a protracted procedural history not relevant to this appeal,[4] Judge Dolbin ("the PCRA court") held an evidentiary hearing on the amended PCRA petition and denied relief. The Pennsylvania Supreme Court addressed the merits and affirmed.

---

("[T]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance . . . and no mitigating circumstance . . . ."). As noted above, the District Court did not reach any issues related to sentencing, so they are not before us.

[4] *See Saranchak v. Beard*, 538 F. Supp. 2d 847, 854–56 (M.D. Pa. 2008).

12

*Commonwealth v. Saranchak*, 866 A.2d 292 (Pa. 2005). Saranchak then filed this habeas petition in the United States District Court for the Middle District of Pennsylvania pursuant to 28 U.S.C. § 2254, asserting eleven grounds that he claimed warranted relief. The District Court, without holding a hearing, granted the petition on three issues arising out of the degree of guilt proceedings. It did not address the remaining eight grounds, which included issues related to the penalty phase. *Saranchak v. Beard*, 538 F. Supp. 2d 847 (M.D. Pa. 2008). The Commonwealth appeals.

II.

The District Court had jurisdiction under 28 U.S.C. §§ 2241 and 2254, and our jurisdiction rests upon 28 U.S.C. §§ 1291 and 2253. Because the District Court ruled on Saranchak's habeas petition without an evidentiary hearing, our review of its decision is plenary. *Thomas v. Horn*, 570 F.3d 105, 113 (3d Cir. 2009) (citation omitted). We review the decision of the state court under the same standard that the District Court was required to apply. *Id*.

The federal courts have the power to issue writs of habeas corpus to prisoners in state custody on the sole ground that the individual "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Saranchak argues that he is in custody in violation of the Constitution, specifically his "right . . . to have the Assistance of

13

Counsel for his defense." U.S. Const. amend. VI. The assistance of counsel has been interpreted to mean the "*effective* assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)) (emphasis added). To make out a claim of ineffective assistance of counsel, and thus be entitled to collateral relief from a conviction or sentence, a habeas petitioner must show that his counsel's performance was deficient and that this deficient performance caused him prejudice. *Strickland*, 466 U.S. at 687. To be deficient, counsel's performance must fall below an objective standard of reasonableness. *Id.* at 687–88. To demonstrate prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

An application for a writ of habeas corpus by a prisoner in state custody, whose claims were adjudicated on the merits in the state system, will be granted only if the adjudication of the claims by the state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The "determination of a factual issue made by a State court [is] presumed to be correct. The applicant [has] the burden of rebutting the presumption of correctness by clear and

14

convincing evidence." *Id.* § 2254(e)(1).

## III.

The three claims before us arise out of Saranchak's degree of guilt hearing: (1) whether Watkins was ineffective for failing to investigate thoroughly and present adequately a diminished capacity defense; (2) whether Watkins was ineffective for failing to ask the trial court to suppress statements made to the state police officers; and (3) whether Watkins was ineffective for failing to seek suppression of the statements made to Laurie Garber. We will address those claims in reverse order.

## A.

Saranchak contends that Watkins was ineffective because he did not seek suppression of the statements Saranchak made to Garber while in jail.[5] These statements, he argues, were introduced into evidence in violation of his Fifth Amendment right against self-incrimination and in violation of his Sixth Amendment right to counsel.

---

[5] Watkins filed and later withdrew an Omnibus Pretrial Motion that, among other things, sought suppression of the statements challenged here. The circumstances surrounding the motion's withdrawal are immaterial to our disposition of this appeal.

The Fifth Amendment requires that a person subjected to interrogation while in custody be advised that he has the right to remain silent and the right to have a lawyer present. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).[6] If questioning takes place and incriminating statements are made absent this procedural safeguard, the statements must be suppressed. *Id.*; *United States v. DeSumma*, 272 F.3d 176, 179 (3d Cir. 2001). The interrogation necessary to trigger the need for *Miranda* warnings is not limited to the quintessential station-house police interrogation. After all, the *Miranda* Court was concerned with "the 'interrogation environment' created by the interplay of interrogation and custody [that] would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." *Rhode Island v. Innis*, 446 U.S. 291, 298 (1980) (quoting *Miranda*, 384 U.S. at 457).

In *Mathis v. United States*, 391 U.S. 1 (1968), the defendant was in prison serving a state sentence. An agent of the Internal Revenue Service met with him and questioned him about discrepancies in two of his federal tax returns in the course of a "routine tax investigation" that was, at the time, purely civil in nature. *Id.* at 4. The defendant made incriminating statements that were later introduced at his criminal trial for tax fraud. The Supreme Court held that the

_____

[6] The parties dispute whether Saranchak, when he met with Garber, was "in custody," for purposes of *Miranda*. We assume for purposes of this opinion that he was.

16

statements, taken without *Miranda* warnings, should have been suppressed. *Id.* at 5. This was true even though the "interview was indistinguishable from the thousands of inquiries into tax liability made annually as a necessary adjunct to operation of our tax system." *Id.* at 6 (White, J., dissenting). It did not matter that the defendant was "in familiar surroundings." *Id.* at 7 (White, J., dissenting) (distinguishing this interview from a "police station interrogation of someone charged with or suspected of a crime"). Because the defendant was in custody at the time of questioning, and because of the ever-present possibility that tax investigations could wind up as criminal prosecutions, the Fifth Amendment was implicated. *Id.* at 4 (majority op.). Indeed, "the availability of the privilege [against self-incrimination] does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." *In re Gault*, 387 U.S. 1, 49 (1967).

In *Estelle v. Smith*, 451 U.S. 454 (1981), the Supreme Court again analyzed the Fifth Amendment's protections vis-à-vis questioning by someone other than a law enforcement officer. There, the trial judge, without a motion by either party, ordered a psychiatric evaluation of the criminal defendant to determine his competency to stand trial. Without administering *Miranda* warnings, a doctor examined him for 90 minutes, concluded that he was competent to stand trial, and filed a short report to that effect. *Id.* at 456–57. At the capital sentencing phase, the doctor was the state's sole witness and testified on the

17

question of the defendant's future dangerousness, a key factor in determining a sentence of death and one on which the state bore the burden of proof beyond a reasonable doubt. *Id.* at 457–58. Though his initial report only termed the defendant "a severe sociopath," with no more specific reference to the issue of future dangerousness, the doctor offered seven very specific and damning opinions on the defendant's future dangerousness. *Id.* at 459–60. The jury returned answers to special interrogatories that rendered the death penalty mandatory. *Id.* at 460. The defendant sought federal habeas review, and the district court vacated the death sentence based on the admission of the doctor's statements. *Id.* The Fifth Circuit affirmed. In affirming the lower courts, the Supreme Court rejected the contention that the defendant's statements to the doctor, because they were made in a pretrial competency evaluation, were akin to handwriting or voice exemplars and thus not protected by the Fifth Amendment. To the contrary, the Court noted that it was the substance of the defendant's discussion with the doctor—describing the details of the crime—that provided the basis for the doctor's opinion of future dangerousness. *Id.* at 463–64. The defendant was given no warning that this "compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death." *Id.* at 467. Because he "did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements," his Fifth Amendment right against self-incrimination was violated. *Id.* at 468. The Court went out of

18

its way to reiterate that what had taken place was "a court-ordered psychiatric inquiry" while the defendant was in custody. *Id.* at 469.

It is clear, then, that assuming the defendant is in custody, interrogation *vel non* is the focal point of *Miranda*'s protection against the evidentiary use of self-inculpatory statements. *Innis*, 446 U.S. at 300. A criminal defendant always runs the risk of having his statements used against him if he makes them voluntarily. "The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . . Volunteered statements of any kind are not barred by the Fifth Amendment . . . ." *Miranda*, 384 U.S. at 478. Without government agents actually eliciting statements, there is no risk of *compelling* a defendant to incriminate himself. *Innis*, 446 U.S. at 300 ("'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.") (footnote omitted).

Here, the Pennsylvania Supreme Court concluded that Garber did not interrogate Saranchak. It noted that she was visiting Saranchak to discuss matters related to proceedings involving his children: "The caseworker interviewed Appellant shortly after his arrest, *concerning his children*, who were in foster care as the result of his incarceration." *Saranchak*, 866 A.2d at 302 (emphasis added). And again: "Here, the CYS

19

caseworker was concerned with the plight of Appellant's children. She was a stranger to any aspect of the criminal case. Her question regarding the murders was purely conversational and was not made with the purpose of soliciting information from Appellant about the crimes." *Id.* at 302. This characterization is accurate. Garber testified at the degree of guilt hearing that she and Saranchak were discussing visitation with his children when she expressed her inability to understand how the murders happened. It is unremarkable that a CYS worker involved in structuring visitation rights of minor children with a suspected murderer and forwarding letters from him to those children would wonder how, if at all, the suspect became involved in the crime. When Saranchak "freely admitted to killing [Edmund]" and "also admitted to killing [Stella]," *id.* at 302, Garber's follow-up question was not an interrogation eliciting incriminating information: "During our court hearing the judge had asked him about what he was in prison for and what he was pleading and he said he was pleading not guilty and I asked him why he had said that at our court hearing." It struck Garber as odd that Saranchak would so readily admit to the murders both to her and to his children in the letters he planned on sending them when he had told the judge presiding over the CYS matter that he was pleading not guilty. Thus, Saranchak was able to qualify his answer, stating that he would serve time for the murders but not for the other charges because he had not stolen anything. Saranchak went on to tell Garber that, after he killed Edmund and Stella, he bent down to check on his dog because he did not know how it would react to the dead bodies.

20

Whatever effect this statement may have had on Judge Dolbin's conclusion concerning Saranchak's intent on the night of the murders, it was not elicited by any "express questioning or its functional equivalent" by Garber. *Innis*, 446 U.S. at 300–01.

Garber the CYS worker is hardly the Internal Revenue agent-turned-informant in *Mathis*. Her interview with Sarnachak was not of the kind, like a tax investigation, that has a high probability of leading to informant testimony at a criminal trial. It is no quantum leap to conclude that a civil tax investigation may lead to a criminal inquiry. *Mathis*, 391 U.S. at 4–5. The same could be said for a CYS interview of a person *charged with offenses involving children*. *See, e.g.*, *Commonwealth v. Ramos*, 532 A.2d 465 (Pa. Super. Ct. 1987) (statements made to CYS caseworker without *Miranda* warnings held inadmissible where caseworker was investigating charges relating to sexual abuse of a child for which the defendant was incarcerated pending trial). It is quite another matter to say that a CYS worker like Garber, answering questions about visitation and letters to children and explaining the CYS court process, should know that the person she is interviewing would freely admit to committing two murders. The testimony at the PCRA hearing establishes that Saranchak helped Garber to understand how the murders happened. It fails to reveal interrogation compelling him to do so. This is not akin to the tax man knocking on your door (or, as in *Mathis*, your prison cell) and asking you questions about your returns.

21

Though decided on Sixth Amendment grounds, our decision in *Bey v. Morton*, 124 F.3d 524 (3d Cir. 1997), is instructive. In that case, an inmate was housed on death row in a New Jersey state prison. Corrections Officer Alexander Pearson's duties of keeping inmates safe and secure were carried out, in part, by regularly engaging them in conversation. Such encounters enabled him to detect possible suicidal tendencies in the inmates. *Id.* at 526. Pearson was aware that the inmate Bey had an appeal pending and was represented by counsel. Notwithstanding such knowledge, Pearson spoke with Bey about "'why he was [t]here' and 'why he did it.'" *Id.* The guard also "'asked him why he would do that. What kind of mind you was in.'" *Id.* When the appeal resulted in a retrial, the inmate's incriminating statements to the guard were admitted into evidence. We held that there was no error "because there was no deliberate elicitation of incriminating information for use in connection with a prosecution." *Id.* at 525. The guard, "while a state actor, was not a state actor deliberately engaged in trying to secure information from the defendant." *Id.* at 531. While there may have been "elicitation" in a general sense, "there certainly was no 'deliberate elicitation' within the teachings of the cases" the inmate relied upon. *Id.* We explicitly distinguished the guard's actions under those factual circumstances in asking "why" an act was committed from the usual scenario of "questions designed to elicit" incriminating statements because, "most importantly, Pearson did not behave like someone who intended to secure incriminating statements from Bey." *Id.*

Garber's actions cannot be meaningfully distinguished from those of the guard in *Bey*. There was no interrogation of Saranchak because there was no compulsion of incriminating statements for use in a prosecution. *Innis*, 446 U.S. at 300. Garber went to the jail to discuss Saranchak's children and the particulars of visitation. *Saranchak*, 866 A.2d at 302. Indeed, "taken to its logical conclusion, [Saranchak]'s argument, in essence, is that any governmental employee would be required to provide *Miranda* rights before engaging in conversation. Assuming one was in jail, this would include maintenance staff cleaning the facility, cooks preparing food and volunteers offering solace." *Id.* We agree with the Pennsylvania Supreme Court that this is not the law.

We detect no error in the Pennsylvania Supreme Court's conclusion that there was no interrogation by Garber. While the privilege against self-incrimination guaranteed by the Fifth Amendment is "as broad as the mischief against which it seeks to guard," *Counselman v. Hitchcock*, 142 U.S. 547, 562 (1892), it is not implicated with respect to Garber's actions because her meeting with Saranchak did not "contain[] inherently compelling pressures which work[ed] to undermine [Saranchak's] will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467; *United States v. Benton*, 996 F.2d 642, 644 (3d Cir. 1993) (no *Miranda* violation because officer's remarks "gave [the

23

defendant] no incentive" to make his incriminating statement).[7] The Pennsylvania Supreme Court's rejection of the claim of ineffective assistance of counsel regarding Watkins's failure to seek suppression of the statements to Garber was not an unreasonable application of, or contrary to, clearly established federal law. 28 U.S.C. § 2254(d)(1). Watkins's failure to seek their suppression did not amount to ineffective assistance of counsel.

B.

Saranchak next contends that Watkins was ineffective for failing to seek suppression of statements made to the state police officers. He argues that these statements were introduced into evidence at the degree of guilt hearing in violation of his Fifth Amendment right against self-incrimination. The PCRA court

---

[7] Saranchak also imbedded within his claim of ineffectiveness for not protecting his Fifth Amendment rights a claim of ineffectiveness for not protecting his Sixth Amendment right to counsel during Garber's interview. "The definitions of 'interrogation' under the Fifth and Sixth Amendments, if indeed the term 'interrogation' is even apt in the Sixth Amendment context, are not necessarily interchangeable, since the policies underlying the two constitutional protections are quite distinct." *Innis*, 446 U.S. at 300 n.4. Nevertheless, we conclude that Garber did not engage in the type of deliberate elicitation of incriminating statements from Saranchak necessary to cause a violation of his Sixth Amendment rights. *Bey*, 124 F.3d at 531–32.

24

denied relief on this ground in part because the other evidence against him "was sufficient to establish his guilt of first degree murder beyond a reasonable doubt." The Pennsylvania Supreme Court essentially adopted this conclusion when it determined that Saranchak suffered no prejudice by the admission of these statements "due to the overwhelming evidence of [his] guilt." *Saranchak*, 866 A.2d at 301. Although the State Police probably did violate Saranchak's *Miranda* rights, we need not resolve that issue because we agree with the Pennsylvania Supreme Court that no prejudice resulted.

When Saranchak was questioned by the state police, he was read *Miranda* warnings several times. Initially, Saranchak's responses concerned only the illegal trash dumping, in which he readily admitted his involvement. When officers continued to question him about his activities on the night of the murders, Saranchak assumed a military posture and demeanor. He stated that the information the officers sought was classified. Before long, however, Saranchak admitted to killing his uncle. As to his grandmother, he refused to budge from his position that his presence in the house that night was part of a classified military mission and that the police officers should not question him about it.[8]

---

[8] Before us, Saranchak argues that he asserted his right to silence even before admitting to killing Edmund. As support, he relies on testimony at the sentencing hearing by Corporal Reynold Wagner, whose paraphrasing of Saranchak's assertions that the

25

Saranchak's assertions that the information was classified, however bizarre, were probably sufficient to invoke his right to silence. *Cf. Quinn v. United States*, 349 U.S. 155, 164 (1955) ("As everyone agrees, no ritualistic formula is necessary in order to invoke the privilege."). Thus, we will assume that Saranchak asserted his Fifth Amendment right to silence and that the continued interrogation violated that right. Even so, the admission into evidence of Saranchak's elicited statements caused him no prejudice.

The inculpatory content of Saranchak's statements to the police is probative of two things: his involvement in the killing of Edmund, and his intent in doing so. Whatever was probative of his *involvement* in the killing is of no moment for our purposes because Saranchak had already entered a plea of guilty to murder generally. The fact that he shot and killed Edmund was established through the guilty plea colloquy, so that the exclusion of his statements probative of the same would not have helped his case. The degree of guilt hearing was concerned only with Saranchak's *intention* in killing Edmund and Stella. Thus, the admissibility of the statements insofar as

_____

mission was classified could be read to suggest that he invoked his right to silence before he confessed to Edmund's murder. We note that the Pennsylvania Supreme Court understood Saranchak to be claiming to have "invoked his right to silence after confessing to killing [Edmund]." *Saranchak*, 866 A.2d at 301. Because we ultimately see no prejudice in Watkins's failure to move to suppress these statements, we need not weigh in on this discrepancy in timing.

26

they are probative of his intent presents a closer call.

Pennsylvania State Trooper Kirk A. Kirkland testified at the degree of guilt hearing as to his interrogation of Saranchak. After Saranchak invoked his right to silence by claiming that his "mission" was "classified," Trooper Kirkland was alone with Saranchak in an interview room. He told Saranchak that he did not understand how Edmund's killing had taken place. Saranchak then explained. Saranchak directed Kirkland where to walk, stand, aim, fire, and eject the shell casing in a recreated version of the shooting. Kirkland testified to this re-creation at the degree of guilt hearing.

The version of events as recounted by Trooper Kirkland supports a premeditated and deliberate killing of Edmund. The account presents Saranchak entering the basement with the purpose of executing his uncle and then carrying out the execution. Yet Saranchak has not shown that Watkins's failure to seek to exclude this evidence creates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The manner in which the shootings were carried out was summed up in the eye-witness testimony of Miles, a co-conspirator to the shootings. Moreover, the physical evidence, including the nature of the wounds and the fact that the shell casing was found under Edmund's body, amply demonstrates that these killings were intentional. Finally, the testimony of Garber, which we have concluded was properly

27

admitted, also supports the intentional nature of the killings. Trooper Kirkland's testimony may have "had some conceivable effect on the outcome of the proceeding," *id.* at 693, but that is not the test. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. We conclude that Saranchak, by the evidence he introduced at the PCRA hearing, has failed to establish "a reasonable probability that, but for" the admission of his statements to the State Police, "the result of the proceeding would have been different." *Id.* at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome."). That same conclusion reached by the Pennsylvania Supreme Court, 866 A.2d at 301–02, was not an unreasonable application of, or contrary to, clearly established federal law. 28 U.S.C. § 2254(d)(1).

C.

Saranchak's final contention is that Watkins was ineffective in his investigation and presentation of a diminished capacity defense at the degree of guilt hearing. The diminished capacity defense seeks to negative the intent element of a charge of first degree murder, thereby reducing it to murder of the third degree. *Commonwealth v. Taylor*, 876 A.2d 916, 926 (Pa. 2005). A diminished capacity can result from a variety of factors, including voluntary intoxication. *See Commonwealth*

28

*v. Vandivner*, 962 A.2d 1170, 1177 (Pa. 2009).[9] The defense will be successful only "if the evidence shows that the defendant was 'overwhelmed to the point of losing his faculties and sensibilities.'" *Commonwealth v. Blakeney*, 946 A.2d 645, 653 (Pa. 2008) (quoting *Commonwealth v. Breakiron*, 571 A.2d 1035, 1041 (Pa. 1990)). Even "ample evidence" that a defendant "used mind-altering drugs at the time of the offense," standing alone, is insufficient because such drugs must be shown to have intoxicated a defendant "to such an extent that he was unable to form the requisite intent." *Commonwealth v. Spotz*, 896 A.2d 1191, 1218 (Pa. 2006) (quotation omitted). Diminished capacity is "an extremely limited defense" that requires a defendant to establish through "extensive psychiatric testimony [that he] suffered from one or more mental disorders which prevented him from formulating the specific intent to kill." *Commonwealth v. Cuevas*, 832 A.2d 388, 393 (Pa. 2003) (citing *Commonwealth v. Zettlemoyer*, 454 A.2d 937, 943 (Pa. 1982)). That is, psychiatric testimony addressing "'mental disorders affecting the cognitive functions of deliberation and premeditation necessary to form a specific intent' is admissible. However, psychiatric evidence that a defendant lacked the ability to control his actions or that he acted impulsively," for

---

[9] Voluntary intoxication itself is not a defense to a criminal charge in Pennsylvania, 18 Pa. Cons. Stat. § 308, but evidence of intoxication may be offered to reduce a conviction for murder, as noted above, from the higher degree to the lower degree. *Id.*; *Commonwealth v. Blakeney*, 946 A.2d 645, 653 (Pa. 2008).

example, "is irrelevant and inadmissible on the issue of the defendant's specific intent to kill. *Vandivner*, 962 A.2d at 1183 (quoting *Zettlemoyer*, 454 A.2d at 943) (alteration omitted). Where expert testimony does not speak to mental disorders affecting the cognitive functions of deliberation and premeditation, it is inadmissible. *Commonwealth v. Ventura*, 975 A.2d 1128, 1141 (Pa. Super. Ct. 2009) (quotation omitted). Thus, evidence of "personality disorders or schizoid or paranoid diagnoses," which includes "substance abuse, adjustment disorder, antisocial personality features and depressive features," is "not relevant to a diminished capacity defense." *Id.* (quotation omitted). Finally, expert testimony that the defendant suffered from depression, auditory hallucinations, schizoaffective disorder, delusio, pathological paranoia, and even a tenuous ability to apprehend reality is irrelevant to, and inadmissible in support of, a diminished capacity defense. *Commonwealth v. Kuzmanko*, 709 A.2d 392, 397–99 (Pa. Super. Ct. 1998).

Saranchak easily meets the deficient performance prong on this claim. At the time of his trial, Pennsylvania law was clear that a diminished capacity defense requires expert testimony. *Cuevas*, 832 A.2d at 393 (citing *Zettlemoyer*, 454 A.2d at 943); *see also Commonwealth v. Fierst*, 620 A.2d 1196, 1204 (Pa. Super. Ct. 1993) (referring to "those cases which have discussed the need for expert psychiatric testimony in cases where a defense of diminished capacity is proffered"). Watkins originally sought a court order for a mental evaluation of, *inter*

30

*alia*, Saranchak's capacity to form a specific intent. But the trial court's order for an evaluation of Saranchak did not extend to his capacity to form specific intent, and Watkins did not return to the court with a further request. Watkins nevertheless presented what purported to be a diminished capacity defense at the degree of guilt hearing, albeit without offering expert testimony. Because the Pennsylvania Supreme Court has declared that this defense requires expert testimony, *Cuevas*, 832 A.2d at 393, counsel's performance was *per se* unreasonable. *Cf. Porter v. McCollum*, 558 U.S. ___, 130 S. Ct. 447, 453 (2009) (per curiam) ("Here, counsel did not even take the first step of interviewing witnesses or requesting records.") (citation omitted).

Deficient performance alone, however, does not entitle a petitioner to habeas relief. For deficient performance to violate the Sixth Amendment, counsel's dereliction of duty must also be prejudicial to his client. *Strickland*, 466 U.S. at 691–92. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The Pennsylvania Supreme Court, reviewing the evidence adduced at the evidentiary hearing held by the PCRA court, concluded that Saranchak suffered no prejudice by Watkins's failure to offer expert testimony at the degree of guilt

31

hearing on the issue of diminished capacity. *Saranchak*, 866 A.2d at 301. A federal habeas court is deferential to the merits determinations made by a state collateral relief court. 28 U.S.C. § 2254(d), (e); *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003) (citations omitted). However, the *Strickland* standard differs from that applied by the Pennsylvania Supreme Court on the issue of prejudice in this case. That Court employed a subjective review of the evidence introduced at the PCRA hearing and analyzed the effect it would have had on the judge presiding, and acting as factfinder, at the degree of guilt hearing. *See Saranchak*, 866 A.2d at 300–01 (noting that "the court, nevertheless, would have returned" the same verdict, and highlighting the fact that the PCRA judge was also the judge at the degree of guilt hearing). It upheld the PCRA court's decision by considering the effect the new evidence would have had on that particular judge—Judge Dolbin—rather than considering, more abstractly, the effect the same evidence would have had on an unspecified, objective factfinder, as required by *Strickland*, 466 U.S. at 695 ("The assessment of prejudice . . . . should not depend on the idiosyncracies of the particular decisionmaker . . . .").[10]

_____

[10] The District Court may also have incorrectly employed the subjective standard. *Saranchak*, 538 F. Supp. 2d at 877 ("The court is persuaded that if *the trial court* had heard testimony from Dr. Kruszewski on his evaluation of Saranchak's mental capacity . . . that *the trial court*, following the law, would have found Saranchak guilty of third degree murder, not first degree murder.") (emphasis added). Because our review of the decision of the district court is plenary, we

32

This fact does not mandate that Saranchak's petition be granted. That the state court evaluated the evidence in a manner other than as the Supreme Court requires does not *ipso facto* entitle Saranchak to a new trial. He "is not entitled to relief in the federal courts unless he can show that he was in fact denied effective assistance of counsel, not merely that the state courts" applied a different standard. *Gibbs v. VanNatta*, 329 F.3d 582, 584 (7th Cir. 2003). Saranchak must still establish that his lawyer's deficient performance prejudiced him and thereby violated the Sixth Amendment. *See* 28 U.S.C. § 2254(a). We conclude that even under a non-deferential, *de novo* review of the state court's determination, Saranchak has not carried that burden.

The Commonwealth presented overwhelming evidence of Saranchak's specific intent to murder Edmund and Stella at the degree of guilt hearing. First, the injuries resulting in the deaths of both victims were caused by a rifle aimed at a vital part of the body. Under Pennsylvania law, "the use of a deadly weapon on a vital part of the body is sufficient evidence to prove the specific intent to kill." *Commonwealth v. Santiago*, 980 A.2d 659, 662 (Pa. Super. Ct. 2009) (citation omitted); *see also Zettlemoyer v. Fulcomer*, 923 F.2d 284, 297 (3d Cir. 1991) (citing *Commonwealth v. Davis*, 479 A.2d 1077, 1080 (Pa. Super. Ct. 1984)).

---

need not consider this possible error further.

33

Further, before Saranchak and Miles first left Courtney's Bar some hours before the shootings, Saranchak told Miles that he knew where they could get some money but that they might have to kill someone to get it. *Saranchak*, 866 A.2d at 296. Then, while enroute from Courtney's Bar to Saranchak's grandmother's house, Saranchak stopped to obtain his brother's .22 caliber rifle. When his wife pleaded with him not to leave with the rifle, Saranchak "feigned" that he was going hunting. *Id.* When Saranchak and Miles arrived at Stella's house, Saranchak exited the vehicle, rifle in hand, and declared he was going to get some money. *Id.* at 301. All of this is evidence of specific intent.

When Saranchak entered the basement door of his grandmother's house, he walked directly to his uncle and shot him. *Id.* at 296. Saranchak and Miles then rolled Edmund's lifeless body back and forth while they searched through his pockets. *Id.* They then went upstairs, and Saranchak asked Miles to shoot Stella. When Miles refused, Saranchak shot her himself. *Id.* After killing Stella, Saranchak and Miles lowered the bedroom blinds and went through her personal belongings, looking for money to steal. *Id.* Before leaving, Saranchak returned to the basement to look for the shell casing spent in Edmund's killing.

While incarcerated pending trial, Saranchak told Laurie Garber that he was not intoxicated on the night in question, but

34

that he "snapped."[11] He also told her that Edmund had "married a whore" and that Edmund's children had received an inheritance that was rightfully his. Saranchak described the killing of Edmund to Garber in a very matter of fact manner, and also conveyed to her the impression that he did Stella a favor by killing her because she was very ill. All of the foregoing supports a finding of specific intent.

In addition to the evidence recounted above, and despite the alcohol consumed, we are mindful that at oral argument counsel acknowledged that Saranchak was doing all of the

---

[11] As stated above, a diminished capacity defense will be successful "if the evidence shows that the defendant was 'overwhelmed to the point of losing his faculties and sensibilities.'" *Blakeney*, 946 A.2d at 653 (quoting *Breakiron*, 571 A.2d at 1041). We do not believe that Saranchak's simple assertion that he "snapped" satisfies this requirement. *Cf. Commonwealth v. Pruitt*, 951 A.2d 307, 315 (Pa. 2008) ("Appellant's statement constitutes evidence of his capacity—at the time of the murder—to formulate a plan, to act deliberately in pursuit of that plan, and then to take steps to attempt to conceal his actions. This is not the behavior of someone whose sensibilities have been overwhelmed."); *see also Commonwealth v. Taylor*, 876 A.2d 916, 926 (Pa. 2005) ("[W]e have repeatedly rejected the contention that evidence of a defendant's supposed inability to control his actions—by virtue of an 'irresistible impulse,' a 'compulsion,' or otherwise—is relevant to negate specific intent, and we have consistently held that such evidence may not be admitted in support of a diminished capacity defense.") (citation omitted).

driving on the night of the murders. He drove himself and Miles from Courtney's Bar to a store to purchase beer, to his stepfather's house to get the gun, to a bar to purchase more beer, to his uncle and grandmother's house to shoot them, back to Courtney's Bar, and finally to a diner. Saranchak purposefully drove from place to place completing his intended objectives, demonstrating significant cognitive function.

The foregoing, all of which was presented to Judge Dolbin, shows someone who was anything but "overwhelmed to the point of losing his faculties and sensibilities." *Blakeney*, 946 A.2d at 653 (quoting *Breakiron*, 571 A.2d at 1041).

"It is firmly established that a court must consider the strength of the evidence in deciding whether the *Strickland* prejudice prong has been satisfied." *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999). The record adduced at the degree of guilt hearing was "amply sufficient to prove that [Saranchak] acted with a specific intent to kill." *Vandivner*, 962 A.2d at 1176. The record included, briefly, (1) eyewitness testimony from Roy Miles about Saranchak's behavior prior to and after the murders, as well as about the murders themselves; (2) Saranchak's admissions to Laurie Garber about killing the victims and why he did it; (3) medical testimony about the cause of death being gunshot wounds and Saranchak's open guilty plea establishing that the manner of death was homicide; (4) Saranchak's statement to Miles that they would have to shoot someone to get money, his retrieving a rifle and going with it,

36

loaded, to the victims' house, shooting both victims, and telling Miles to shoot his grandmother before he himself did it; and (5) the use of a gun on the victims' heads. This is strikingly similar to the record in *Vandivner*, which included the following facts: (1) eyewitness testimony to the murder that the defendant shot the victim in the head with a handgun; (2) defendant "freely admitted to police that he had killed" the victim; (3) medical testimony as to the cause of death and the manner of death; (4) defendant went to the victim's home with a loaded handgun, made a statement to the victim that he would kill her, and promptly followed through with it; and (5) the use of a deadly weapon on a vital part of the victim's body. *Vandivner*, 962 A.2d at 1176. Moreover, this case contains evidence that Saranchak told Miles to look for the shell casing after shooting Edmund, and that the pair did look for it; that after shooting Stella, Saranchak and Miles lowered the blinds and went through her belongings, stealing money; that Saranchak had a motive to murder Edmund because he thought Edmund had "married a whore" and that their children had received Saranchak's rightful inheritance; and that Saranchak did all of the driving on the night of the murders and acted according to a plan. All of this evidence, moreso than that in *Vandivner*, is "amply sufficient," *id.*, to support the verdict rendered. More to the point, the verdict from the degree of guilt hearing had "overwhelming record support." *Strickland*, 466 U.S. at 696. Thus, it would take a considerable amount of new, strong evidence to undermine it. *See id.* at 695–96. The record, however, even as supplemented by the evidence adduced at the

37

PCRA hearing, admits of no reasonable probability of a different outcome.

The PCRA hearing was conducted more than eight years after the degree of guilt hearing.[12] The evidence presented at that proceeding included the testimony of Saranchak's two half-brothers, his stepfather, Miles, Watkins, and two mental health experts. Saranchak's family members testified generally about his family life and his behavior when he was drinking compared to his conduct when he was not drinking. They also testified to his demeanor on the night of the murders. This evidence was irrelevant. *Commonwealth v. Brown*, 578 A.2d 461, 466 (Pa. Super. Ct. 1990) (holding psychiatrist's and mother's testimony to defendant's "past bizarre behavior" not relevant to diminished capacity defense). Watkins recounted nothing more than his understanding of the applicable law and his choices in representing Saranchak. Miles generally reiterated his testimony from the degree of guilt hearing regarding Saranchak's purposeful conduct, but recanted that portion in which he had claimed to hear Saranchak say they might have to shoot someone to get money.[13]

_____

[12] The degree of guilt hearing was held on September 6, 1994, with the verdict announced two days later. The evidentiary hearing in the PCRA matter was conducted on February 11 and 19, 2003.

[13] The PCRA court did not disturb its earlier factual finding—at the degree of guilt hearing—that Saranchak made this statement to Miles on the night of the murders. The Pennsylvania

Dr. Harry Krop, a psychologist who first interviewed Saranchak during the collateral relief process, testified that Saranchak had "adult attention deficit disorder" and "problems focusing," that he had mood disorders and depression, and "a personality disorder . . . with paranoid and anti-social features." He referred to the paranoid disorder as a delusional disorder. He recounted that Saranchak's parents divorced when he was two years old, that Saranchak's father was an abusive alcoholic who was in and out of jail, and that his mother was treated for depression. According to Krop, all of this "deformed Mr. Saranchak's overall personality and coping skills and problem solving skills." Saranchak, he said, developed a "poor self-concept, as a result of poor coping skills," was rejected by the military, and "almost started living in a fantasy world about being in the military." When Saranchak was intoxicated, Krop observed, "sometimes there was a blurring of fantasy and reality in terms of this militaristic lifestyle that he almost perceived himself truly to be in the military and on a mission"; at those times he was "truly delusional." Krop's opinion was that, based on his alcohol consumption on the night of the murders, Saranchak's thought processes would have been impaired, his judgment would have been compromised, and his impulsivity

---

Supreme Court likewise did not disturb it on appeal. *Saranchak*, 866 A.2d at 296. It is thus a finding of fact we "presume[] to be correct," and Saranchak has not carried his burden of rebutting "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

would have been compromised. Krop diagnosed that, at the time of the murders, Saranchak was suffering from "an extreme mental or emotional disturbance," the nature of which was "the combination of the depressive disorder, paranoid personality disorder, possibly delusional again"; that "primarily the combination of psychiatric issues with the level of intoxication put him in an extreme state of emotional disturbance"; that Saranchak's "capacity to appreciate the criminality of what he was doing and to conform his conduct to the law was substantially impaired" "for the same reasons"; and that his belief and statements regarding a military mission and its "classified" status demonstrate he was "somewhat in a paranoid kind of state." Dr. Krop also pointed out Saranchak's resentment toward his uncle due to Edmund's children having received Saranchak's rightful inheritance and the "cumulative resentment" Saranchak harbored toward his grandmother for constantly deriding him.

Dr. Kruszewski, a psychiatrist, testified that alcohol can produce "psychiatric and psychotic effects on an individual's behavior," and cause "[d]epression and psychosis." He said that Saranchak suffered from a Jekyll-and-Hyde–type personality disorder, explaining that when Saranchak drinks, "he has specific delusions that are presumably a result of the alcohol and behaves in a very different manner." Kruszewski diagnosed Saranchak as suffering from "a psychoactive substance induced, in this case, alcohol induced delusional disorder and alcohol induced depressive disorder." He further opined that Saranchak

40

lacked the capacity to form a criminal intent at the time of the murders because he "was acting within the scope of his delusional beliefs." Saranchak was in a state of extreme mental or emotional distress, which is to say "that his behavior and his thought patterns and his mood and affect were severely compromised by something, in this case alcohol and the psychotic features as a result." He also had a history of "[a]cting out in an antisocial manner."

The addition of the PCRA evidence into the record does not reveal prejudice. The testimony of Saranchak's family members, Miles, and Watkins offered no new insight into whether Saranchak experienced a diminished capacity on the night of the murders. It was not expert psychiatric testimony, and was thus irrelevant on that issue. *Brown*, 578 A.2d at 466. The expert testimony offered by Dr. Krop and Dr. Kruszewski consisted almost totally of the type of evidence the Pennsylvania courts hold irrelevant and inadmissible. It demonstrates that Saranchak suffered from auditory hallucinations, schizoaffective disorder, delusion, pathological paranoia, and a tenuous ability to apprehend reality. Such testimony is *irrelevant*. *Kuzmanko*, 709 A.2d 392. To the extent it shows Saranchak was unable to control himself or acted impulsively, it is likewise irrelevant. *Vandivner*, 962 A.2d 1170; *Taylor*, 876 A.2d at 926. Both experts testified that Saranchak was anti-social, which is irrelevant. *Ventura*, 975 A.2d 1128. Dr. Krop merely summed up what all knew about Saranchak: he was a very troubled man who carried with him the baggage of a troubled past. He also

41

reaffirmed that Saranchak had a motive to commit these crimes, but Dr. Krop did not offer any opinion on whether Saranchak was able to form the specific intent to kill. His testimony is thus unhelpful. *See Commonwealth v. Williams*, 980 A.2d 510, 527 (Pa. 2009) ("Thus, a defendant asserting a diminished capacity defense . . . contests the degree of culpability based upon *his inability to formulate the requisite mental state*.") (emphasis added).

Dr. Kruszewski did opine that Saranchak lacked the capacity to form a criminal intent, but this opinion was based on irrelevant information: "He was acting within the scope of his delusional beliefs the best I can put it together." *See Kuzmanko*, 709 A.2d 392 (evidence of delusion is irrelevant to a diminished capacity defense). Accordingly, if offered at the degree of guilt hearing, the opinion would have been inadmissible. *Id.* at 398–99 (approving of exclusion of expert's opinion that defendant's ability to form specific intent to kill was adversely affected because it was based on irrelevant grounds). The only evidence introduced at the PCRA hearing that—possibly—would have been admissible at trial on the diminished capacity issue is Dr. Kruszewski's fleeting testimony that Saranchak was depressed as a result of his alcohol consumption. *See Commonwealth v. Legg*, 711 A.2d 430, 444, 448 (Pa. 1998) (evidence of "major depression with anxiety at the time of the shooting," which in expert's opinion was sufficient to "distort[] her perception of the situation with her ex-husband and impair her judgment" because it was

42

"associated with her feelings of anger and betrayal," admissible on the question of diminished capacity). Dr. Kruszewski testified only that Saranchak had an "alcohol induced depressive disorder when drinking" and noted "the psychosis that he experienced as a result."

What little might be gleaned from Dr. Kruszewski's testimony does not give rise to a reasonable probability that the outcome of the degree of guilt hearing would have been different. As recounted above, there was *ample* evidence of Saranchak's specific intent to murder Stella and Edmund, and it would have taken much to disturb it. *Strickland*, 466 U.S. at 695–96. This case stands in contrast to *Jacobs v. Horn*, 395 F.3d 92 (3d Cir. 2005), where we concluded that evidence of the defendant's impaired cognitive function unearthed at the PCRA stage was sufficient to give rise to a reasonable probability that, had it been introduced at trial, it would have altered the outcome. However, in *Jacobs* there was no evidence of the defendant's behavior and plan prior to the victims' deaths. The facts of that case only include a call to the police alerting them to the crime scene, a witness's testimony recounting the defendant's inculpatory statements, and then evidence from the crime scene itself. *Jacobs*, 395 F.3d at 98. There is no indication that evidence of the defendant's statements, thoughts, or movements prior to the killings were ever presented to the finder of fact. The defendant's diminished capacity and other defenses at trial failed, but upon delving further into possible support for the failed diminished capacity defense, the

43

defendant's experts uncovered evidence of brain damage and other cognitive maladies. We concluded that his counsel's failure to introduce this at trial was prejudicial under *Strickland*. *Id.* at 105. That is, the defendant was deprived of "a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

In this case, both experts who testified at the PCRA stage presented a thorough evaluation of Saranchak's mental health. Yet Dr. Krop's testimony did not satisfy the legal requirements of a diminished capacity defense under Pennsylvania law, and Dr. Kruszewski's abbreviated reference that Saranchak is depressed when he drinks is the only portion of his testimony that was relevant to the defense. Neither could explain away Saranchak's stated intent to obtain money, his retrieval of the gun, his deliberate method of committing the murders, or his admitted motive for doing so. "The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Strickland*, 466 U.S. at 695. After a thorough review of not only the testimony of Dr. Krop and Dr. Kruszewski, but the entire PCRA record and degree of guilt hearing record, we conclude that there is not "a reasonable probability that, absent the errors" made at the degree of guilt hearing, a rational, objective factfinder following the directive just quoted "would have had a reasonable doubt respecting [Saranchak's] guilt" of first degree murder. *Id.* Thus, Saranchak has failed to establish a reasonable probability that, but for counsel's unprofessional errors in failing to investigate

44

and present a proper diminished capacity defense, he would not have been convicted of first-degree murder. *Id*. at 694. Even a diminished capacity defense that was supported by the expert testimony introduced at the PCRA hearing would have failed to negate the showing, made by the evidence of his behavior prior to the murders and how they were committed, that Saranchak acted with the specific intent to kill.

IV.

Saranchak has failed to show that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). For the foregoing reasons, we will reverse the judgment of the District Court and remand with instructions for the District Court to deny in part Saranchak's Petition For A Writ Of Habeas Corpus By A Prisoner In State Custody with respect to Counts I, II, and III. The District Court shall consider the remaining issues in the petition, including issues related to the penalty phase of the state proceedings.