PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1833
_____

JAMES DELLAVECCHIA,

Appellant

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF
CORRECTIONS; ATTORNEY GENERAL
PENNSYLVANIA; DISTRICT ATTORNEY
DELAWARE COUNTY
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 2-14-cv-05014)
Honorable Harvey Bartle, III, District Judge
_____

Submitted under Third Circuit LAR 34.1(a)
March 3, 2016


BEFORE:  JORDAN, GREENBERG, and
SCIRICA, Circuit Judges

(Filed:  April 15, 2016)
_____

Burton A. Rose
1731 Spring Garden Street
Philadelphia, PA 19103

   Attorney for Appellant

Kelly M. Sekula
Bruce R. Beemer
First Deputy Attorney General
Lawrence M. Cherra
Executive Deputy Attorney General
Criminal Law Division
Amy Zapp
Chief Deputy Attorney General
Appeals and Legal Services Section
Suite 310
1000 Madison Avenue
Norristown, PA 19403

   Attorneys for Appellees

_____

OPINION OF THE COURT
_____

GREENBERG, Circuit Judge.

# I. INTRODUCTION

On this appeal from an order denying a petition for a writ of habeas corpus we consider the Sixth Amendment right to counsel in an unusual set of circumstances. In September 2012, a state-court jury convicted appellant, James Dellavecchia, of first-degree murder, criminal attempt (homicide), three counts of recklessly endangering another person, and weapons-related offenses. At the trial, Lieutenant Scott Willoughby of the Ridley Township, Pennsylvania, Police Department, the lead officer investigating the crimes, gave testimony that is at the center of this opinion. In particular, Willoughby testified that Dellavecchia made an incriminating statement immediately following a bedside arraignment conducted while he was hospitalized for a self-inflicted head injury on the day following his arrest for the commission of the offenses.

It is undisputed that when Dellavecchia made his statement without counsel present and without having been given Miranda[1] warnings, he had not waived the right to counsel. Thus, as the case law we discuss below demonstrates, the dispute concerns whether Willoughby deliberately elicited Dellavecchia's statement or was a mere "listening post" when Dellavecchia, spontaneously and without prompting, volunteered incriminating information.

We conclude that Willoughby did not deliberately elicit Dellavecchia's statement and consequently did not violate Dellavecchia's Sixth Amendment right to counsel. We also

---

[1] See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966).

3

conclude that the evidence at the trial, even disregarding Dellavecchia's statement, overwhelmingly supported his convictions and thus, even if his Sixth Amendment rights had been violated when he gave the statement, the ensuing error when Willoughby recounted the statement at trial was harmless. Therefore, we will affirm the District Court order denying Dellavecchia's petition for habeas corpus.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

Because the District Court did not hold an evidentiary hearing, we draw our statement of facts from the evidence at the trial and a state-court pretrial hearing on a motion that Dellavecchia filed seeking to suppress his statement.[2] Dellavecchia committed the crimes on October 10, 2011.  The events of that day started at approximately 6:00 a.m., when Scott Robins exited his house on Sylvania Avenue in Folsom in Ridley Township, Pennsylvania, to leave for work.  His colleague, Rick Wallace, was waiting for him in the front passenger seat of their work van, which was parked in Robins's driveway.  According to Wallace, who testified at the trial, Robins opened the driver's side door and then placed his belongings in the center console of the van and started to step into the vehicle.  Then Wallace heard gun shots and looked in the direction of Robins who told him to run.  Instead, Wallace exited the van and hid underneath it.  From that position when

---

[2] The parties submitted separate appendices.  We will cite Dellavecchia's appendix as "Pet. App." and will cite the Attorney General of Pennsylvania's appendix as "Pa. App."

4

he looked in the direction of the driver's side of the vehicle, he saw the legs and feet of an individual wearing white sneakers and jeans walking toward the street. Wallace testified that when that individual turned left toward the back bumper of the van, he rolled out from under the vehicle and started to run across the street. At that time, Wallace heard additional gunshots.

Robins's stepdaughter, Kristen Snow, was in a downstairs bedroom in the Robins's family house when Robins left for work. When she heard gunshots, she ran upstairs and went out the front door to look for Robins. Dellavecchia then shot Snow in the stomach and she fell to the ground. Snow testified that after she was shot, "somebody—Mr. Dellavecchia came from behind the van," walked up to her, and "held the gun to [her] head." (Pa. App. at 98a, 136:13-15). She stated that she "stared at his face, [he] stared back [at me, and then] he just turned around and walked away." (Pa. App. at 98a, 136:15-18).

Francis Freeman, a neighbor and long-time acquaintance of Scott Robins, awakened when he heard gunshots that morning. He heard a second round of gunshots and then "heard a woman say, help, call the police." (Pa. App. at 120a, 158:17-18). Freeman called 911, reported the gunshots, and then ran over to Robins and Snow. He was with Robins when the police arrived, and his wife, who came to the scene of the shootings shortly after he did, was with Snow when they arrived.

The first police officer to reach the scene of the shootings was Corporal Michael Bongiorno of the Ridley Township Police Department. Bongiorno knew Robins and Dellavecchia because the latter had made complaints to the Ridley Township Police Department regarding Robins. When he arrived, Bongiorno saw Snow sitting in "a crunched position" on the front lawn

5

"writhing in pain." (Pa. App. at 140a, 178:15-18). When informed that there was another victim, Bongiorno went around the van and found Robins partially underneath the front of the vehicle. Bongiorno testified at the trial that he then had the following conversation with Robins: "I said to him, you know, what the hell happened? What happened? Who shot you? And he said, Dellavecchia. And I said, your neighbor? And he said, yeah. And he went like that with his left hand and kind of pointed towards Ninth Avenue." (Pa. App. at 142a, 180:6-11). Snow and Freeman testified at the trial that they also heard Robins identify Dellavecchia as the shooter to Bongiorno.

After the above exchange, other officers arrived, and Bongiorno, along with Officer Robert Ruskowski, also of the Ridley Township Police Department, left the scene of the shootings and moved toward Ninth Avenue in the direction to which Robins had pointed. While going toward Ninth Avenue, Bongiorno contacted the police dispatcher via his radio communication system and provided the name "Dellavecchia" to the dispatcher whom he asked to get Dellavecchia's address and telephone number. The dispatcher did so and gave Bongiorno this information minutes later. At approximately the same time, a neighbor called out to Bongiorno from across the street, "Dellavecchia's house is that one," and pointed to a particular house. (Pa. App. at 145a, 183:9-17). While still outside the Dellavecchia house, Bongiorno called the dispatcher with a direction to call the Dellavecchia telephone number and ask whoever answered to step outside. "Some seconds later," the dispatcher informed Bongiorno that Mrs. Dellavecchia was on the phone, and she then came to the front door where Bongiorno was standing. (Pa. App. at 146a, 184:11 to 147a, 185:2). In response to Bongiorno's questioning about who else was in the house, Mrs. Dellavecchia stated that her husband was

6

in the shower. Bongiorno then escorted Mrs. Dellavecchia down the driveway and handed her off to another officer with a direction to prevent her from returning to the house.

Bongiorno, along with Ruskowski, then entered the house and walked up the stairs in the direction of the shower. After they found Dellavecchia in an upstairs bedroom getting dressed, they instructed him to freeze. Bongiorno handcuffed Dellavecchia and informed him that he was being detained for an investigation involving a shooting. The officers then removed Dellavecchia from the house, and Ruskowski transported him to the police station. Bongiorno testified that as he stood with Dellavecchia in the upstairs bedroom, he noticed a spot of blood on the bureau and saw a pair of white sneakers that appeared to be wet. Ruskowski, while securing the house, discovered a partially obscured briefcase underneath the bed near where Dellavecchia was dressing. Ruskowski informed Bongiorno of the discovery and pointed out that there was an additional spot of blood on top of the briefcase. At that time, Bongiorno cautioned Ruskowski and another officer who was securing the house not to touch the briefcase and to make sure that no one else was inside the house. While Ruskowski was taking Dellavecchia to the police station and Robins and Snow were being transported to a hospital, Bongiorno turned the crime scene over to detectives and supervisors from the next shift who had begun to arrive at the scene.

Willoughby was one of the officers who arrived at the crime scene at that time. According to Willoughby, he had the responsibility to direct the other officers in the collection of evidence, containment of the crime scene, and coordination with witnesses, among other tasks. Under his supervision, Ridley Township police officers collected evidence from the scene of

the shootings including 13 .40 caliber federal ammunition shell casings and four bullet fragments.

Shortly after his arrival on the scene, Willoughby directed a sergeant who was back at the police station to seek a search warrant for the Dellavecchia home. The sergeant obtained the warrant and delivered it to Willoughby. Then, with the assistance of other members of the Ridley Township Police Department, Willoughby entered the Dellavecchia home to execute the warrant. During the ensuing search the police seized the pair of white sneakers that Bongiorno earlier had noticed. Willoughby explained that as he circled the residence, he noticed a hose in the back of the house where there was a fresh puddle of water with muddy footprints. He surmised that someone recently had cleaned off his shoes at that location. Inasmuch as the white sneakers in the bedroom were wet, Willoughby collected them as evidence.

The officers next seized the briefcase that Ruskowski had discovered underneath the bed. When Willoughby removed the briefcase from that location, he noted "drippings of blood" on the visible top portion. (Pa. App. at 197a, 20:1). The contents of the briefcase included a black plastic box in a plastic bag containing a Ruger .40 caliber semi-automatic handgun and two boxes of .40 caliber federal ammunition which, like the handgun, were inside a black plastic bag. The .40 caliber federal ammunition matched the shell casings found at the scene of the shootings. One box was full and contained all 50 live rounds but the other box was missing 17 rounds.

During the search, Willoughby seized a pair of jeans and a white sweater from Dellavecchia's basement from a spot immediately inside the back door near the place where the hose

8

and fresh puddle were found. Willoughby observed what he thought was a blood stain on the white sweater. It appeared to him that someone hurriedly had removed the clothing so he seized both articles as evidence.

After the officers collected evidence, Willoughby returned to the Ridley Township police station to speak with Dellavecchia. As he prepared to do so, he "heard a loud bang up in the cell." (Pa. App. at 204a, 27:6-8). When Willoughby went to the cell to investigate the noise, he discovered that Dellavecchia had run head first into the jail cell bars and required immediate medical attention. The police then took him to the Chester-Crozer Hospital where he was admitted.

The following day, Willoughby learned that Dellavecchia was coherent, though still hospitalized. Willoughby then brought Vincent Gallagher, Magisterial District Judge for Ridley Township, to the hospital to conduct a bedside arraignment for Dellavecchia. At the arraignment, Dellavecchia was advised that he had been charged with various crimes including the murder of Scott Robins who had died and also was advised of his defendant's rights. Thereafter, as described below, he made the statement to Willoughby that is the basis for this appeal.

After he was indicted, Dellavecchia made a motion to suppress his bedside statement and the state common pleas court held a hearing on the motion on July 18, 2012. At the hearing Willoughby gave, <u>inter alia</u>, the following testimony:

> [A]s soon as District Justice Gallagher arraigned the Defendant he turned and started to walk out of the room. Mr. Dellavecchia asked me who are you. I introduced myself as Lieutenant Scott

Willoughby from the Ridley Township Police Department. I told him I was in charge of the investigation, at which time he asked me to sit. I sat. He put out his hand. I shook his hand. And he stated this. I really fucked up. He asked me to sit down. And he says Scotty, I want to tell you what happened. I sat in the chair and Mr. Dellavecchia began to talk freely and openly.

(Pet. App. at 65a, 48:8-19). Willoughby testified that he did not go to the hospital intending to interview Dellavecchia and consequently did not bring a notepad or a <u>Miranda</u> waiver form with him when he went there. Willoughby explained that until the arraignment, the Ridley Township Police Department was responsible for supervising Dellavecchia's custody, but that after the arraignment that responsibility shifted to prison personnel. Accordingly, Willoughby intended to have Dellavecchia arraigned as soon as possible to facilitate this administrative transition. Willoughby testified that after Dellavecchia blurted out the above statement, he asked Willoughby "if I say anything can it be used against me[?]" (Pet. App. at 70a, 53:11-13). Willoughby responded that anything he said could be used against him.

The first substantive topic that Dellavecchia addressed after his initial statement to Willoughby was his relationship with Scott Robins. Dellavecchia said that they had known each other since Robins was a child because Robins had grown up in the house in which he was living at the time he was shot. Dellavecchia stated that he never was fond of Robins. Dellavecchia told Willoughby that for several months, Robins had been building a shed too close to the property line without the required permits. Dellavecchia also complained that, while

10

Robins was building the shed, he played loud music and used an air staple gun near the property line. On several occasions in the months leading up to the shooting, Dellavecchia had contacted the Ridley Township Police Department to complain about the construction of the shed. He explained that on one occasion, Robins threatened him, and he was intimidated by Robins's size, which prompted him to buy the gun.

Willoughby testified that Dellavecchia continued his uninterrupted narrative and provided the following account of the events of the previous morning. He was "awoken by the sound of somebody tapping on a tin shed" in his yard. (Pet. App. at 73a, 56:16-17). He got up, got dressed, got out his gun, went downstairs, and loaded the gun. "His plan was to go out back and investigate the noise." (Pet. App. at 73a, 56:20-21). He searched his yard, but "wasn't able to find anyone near the shed." (Pet. App. at 73a, 56:24-25). He did, however, "notice that the light was on over at Scott's house," so he "figured that Scott was fucking with him." (Pet. App. at 74a, 57:1-3). He left his yard and walked away from Sylvania Avenue toward Swarthmore Avenue, in the opposite direction from Robins's house. He then made the first left on Swarthmore, the first left on Tenth Avenue, and the first left on Sylvania Avenue—the street on which Scott Robins lived—on his route to return home.

As Dellavecchia approached Robins's house, "Scott's van was running and Scott was standing outside the van door." (Pet. App. at 74a, 57:23-24). Dellavecchia "thought of turning around," but he didn't. (Pet. App. at 74a, 57:24-25). "He just kept walking until he saw that Scott had given him a stare." (Pet. App. at 74a, 57:25 to 75a, 58:2). Then, "Dellavecchia felt really threatened by the way that Scott was looking at him," so

he "pointed his gun and he fired." (Pet. App. at 75a, 58:4-7). Dellavecchia fired the gun "until Scott was gone," at which time "he saw a figure in a white shirt running at him" so he turned and "aimlessly started firing at the figure." (Pet. App. at 75a, 58:10-14). He then noticed that "the gun wouldn't fire any more" and "the slide had been locked back, which meant the gun was empty." (Pet. App. at 75a, 58:14-17). Dellavecchia then ran home, and while doing so defecated on himself. He entered his house through the basement, removed his clothing, and went upstairs to shower. "[T]he next thing he knew the police were coming up the steps and they put him in handcuffs." (Pet. App. at 76a, 59:9-10).

After recounting Dellavecchia's statement at the suppression hearing, Willoughby reiterated that during Dellavecchia's entire narrative, he did not pose any questions to Dellavecchia. Rather, he "just sat and listened" and took notes on several Crozer Hospital forms that he took from a nearby table. (Pet. App. at 76a, 59:24 to 77a, 60:14). Willoughby stated that following this narrative, he asked a series of questions that Dellavecchia answered. Willoughby indicated that he did not give Dellavecchia Miranda warnings. Moreover, even though, as Willoughby was aware, Dellavecchia's son had obtained an attorney for him, Willoughby did not inform Dellavecchia that his son had done so. At the trial, Willoughby provided an account of Dellavecchia's statement similar to the one he gave at the suppression hearing, although in slightly less detail.

Dellavecchia testified at the trial. He first explained his fear of Robins, as well as their feud related to Robins's shed. He then provided a narrative of the events of the day of the shooting, which was, in many respects, consistent with

12

Willoughby's account of Dellavecchia's October 2011 statement. This narrative differed, however, with respect to the point at which Dellavecchia was walking past Robins's house when returning home. Specifically, at trial Dellavecchia testified as follows:

> [Robins] had this expression on his face. He had his left hand on the steering wheel, his right hand on the door and he was leaning forward. So I looked away and within a moment's notice I felt his presence on me and he had me by my right -- right side of my clothing. I went to duck and he hit me right here on the side of my left temple and my ear, knocking my glasses down. As I bent down, he uppercut at me. This guy, amazing. I started seeing stars and I hear my ears ringing. I got my gun in my -- belt, my hands -- my glasses in my hand and he's throwing me around.

(Pa. App. at 320a, 94:3-14). He continued:

> I tried to pull away from [Robins] and he was pulling up on my shirt and what not and my -- I felt my gun come up and I had -- had my gun in my hand and we were banging against the -- the van's side and I was trying . . . to pull away from him, but unfortunately he swung me around the door and now we're in the front of the van.

(Pa. App. at 325a, 99:21 to 326a, 100:10). When asked what happened next, Dellavecchia responded, "I heard gunshots, so obvious[ly] I was firing the gun." (Pa. App. at 326a, 100:25 to 327a, 101:1). Dellavecchia testified that he does not remember

13

pulling the trigger or aiming the weapon at Robins but stated that they: "were flailing around. I was flailing around. I was just trying to get away from him." (Pa. App. at 328a, 102:15-22).

Dellavecchia continued his testimony as follows:

> I was let loose. I broke away. I ran to the van and I notice as I'm running down Sylvania Avenue that I was -- I was in pain. My back was hurting and I was limping and I felt something wet on my spine. I thought I had been shot. I got to my basement. I start taking my clothes off and I soiled myself. I left my clothing there, went upstairs and I was going to clean off.

(Pa. App. at 329a, 103:15-22). He concluded this portion of his testimony by stating that he did not recall being arrested.

After Dellavecchia gave the above testimony he was questioned about the statement he gave to Willoughby in the hospital. When asked whether he understood Willoughby, Dellavecchia stated as follows: "He said do you understand and I said, no. And he said do you want a lawyer, I said I need a lawyer. I don't understand the meaning of what you're saying to me." (Pa. App. at 334a, 108:7-12). Dellavecchia also stated that during this meeting Willoughby asked questions, and when Dellavecchia said he wanted to see his wife, Willoughby responded that he needed a statement first.

On cross-examination, Dellavecchia stated that at the time of his arrest on October 10, 2011, he "had two black eyes, [a] bloody nose, cut lip, bit [his] tongue, [his] right shin area was

14

bleeding and [he] had bruises and contusions [on his] back and arms." (Pa. App. at 351a, 125:11-14). He several times made the crucial statement that he shot Scott Robins. In fact, he stated that it was "obvious" that he "shot and killed Scott Robins." (Pa. App. at 377a, 138:21-25).

To counter Dellavecchia's testimony implying that he shot Robins in self-defense and had sustained injuries in their struggle, the Commonwealth called a law enforcement officer to introduce photographs of Dellavecchia taken on October 12, 2011, two days after the shootings. These photographs did not show that Dellavecchia had been injured. The Commonwealth also introduced testimony from Ruskowski, who had taken Dellavecchia to the Ridley Township police station from his house when he was arrested. Ruskowski testified that during that transport, Dellavecchia did not have black eyes, a bloody nose, a split lip, or any other visible injuries to his face.

The Commonwealth also introduced evidence from the medical examiner in the case, Dr. Frederic Hellman, who testified about, among other things, the cause of death, manner of death, and the removal and transfer of ballistics related to Robins. Hellman said that the cause of death was multiple gunshot wounds and the manner of death was homicide. He testified that he recovered three bullets from Robins's body, including one that entered the right lower back, one that entered the left buttock, and one that entered the beginning of the right thigh bone. Hellman also recovered several bullet fragments in Robins's left and right forearms.

Hellman testified that he did not find in any of these gunshot wounds evidence of "soot, which is the residual of the primer at the base of the bullet," or evidence of "gunpowder

15

stippling, which would be small scrapes or abrasions" on Robins's skin that would have resulted from "gunpowder particles impacting adjacent to an entrance wound." (Pa. App. at 275a, 29:15-24). Hellman explained that generally he finds soot when the distance between the muzzle of the gun and the target area at the time of the shooting measures approximately eight to ten inches and that he generally finds stippling when the distance between the muzzle of the gun and the target area measures two-and-a-half to three feet. Based on this evidence, Hellman indicated that in his opinion the gunshot wounds were not inflicted by a weapon fired within two-and-a-half to three feet of Robins.

## B. Procedural History

As we have indicated, prior to the trial Dellavecchia filed a motion to suppress his October 11 statement to Willoughby. On September 25, 2012, the common pleas court denied the suppression motion with respect to Dellavecchia's spontaneous and unsolicited statement but suppressed his responses to Willoughby's subsequent questions. These rulings were oral, but after Dellavecchia appealed, the common pleas court filed a written opinion explaining the reasons for its decision.[3]

On September 28, 2012, a jury convicted Dellavecchia of the offenses that we set forth above. The common pleas court sentenced Dellavecchia to a mandatory term of life in prison without parole for the murder of Scott Robins and to custodial

---

[3] The written opinion also rejected Dellavecchia's claim contending that the prosecutor was guilty of misconduct relating to credibility issues but we are not concerned with that issue on this appeal.

16

sentences consecutive to the life sentence for the other offenses.

On December 12, 2012, Dellavecchia filed a timely appeal to the Superior Court of Pennsylvania, and on November 20, 2013, a three-judge panel of the Superior Court affirmed his conviction. See Commonwealth v. Dellavecchia, 91 A.3d 1291 (Pa. Super. Ct. 2013); Commonwealth v. Dellavecchia, No. 3418 EDA 2012, 2013 Pa. Super. Unpub. LEXIS 2776 (Pa. Super. Ct. Nov. 23, 2013). That court held that although the Sixth Amendment right to counsel had attached by the time Dellavecchia gave his statement because the Commonwealth already had initiated an adversarial proceeding against him, Dellavecchia's Sixth Amendment rights had not been infringed as Willoughby did not elicit the statement. Dellavecchia filed an application for reargument en banc, which the Superior Court denied on January 28, 2014. Dellavecchia then filed a petition for allowance of an appeal by the Supreme Court of Pennsylvania but that court denied the petition on July 8, 2014. Commonwealth v. Dellavecchia, 95 A.3d 275 (Pa. 2014).

Following the exhaustion of his state-court remedies, Dellavecchia filed a petition for a writ of habeas corpus in the District Court pursuant to 28 U.S.C § 2254 asserting that his Sixth Amendment rights were violated when he gave his statement.[4] The Court referred the case to a magistrate judge who on January 28, 2015, issued a report with a recommendation that the Court deny the petition. On March 2, 2015, the Court approved and adopted the magistrate judge's report and recommendation and denied the petition. Dellavecchia then appealed to this Court and sought a certificate

---

[4] Dellavecchia does not contend that his Fifth Amendment rights were violated.

17

of appealability which we granted.

## III.  STATEMENT OF JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over this action pursuant to 28 U.S.C. § 2254, and we have jurisdiction pursuant to 28 U.S.C. § 1291.  Because the District Court did not conduct an evidentiary hearing, our review of its denial of Dellavecchia's petition for habeas corpus is plenary.  See Thomas v. Horn, 570 F.3d 105, 113 (3d Cir. 2009).  However, the state court's factual findings are entitled to a presumption of correctness, and Dellavecchia bears the burden to rebut that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); see also Kuhlmann v. Wilson, 477 U.S. 436, 459, 106 S.Ct. 2616, 2630 (1986).

## IV.  DISCUSSION

### A.  Habeas Corpus

A district court has authority to issue a writ of habeas corpus on a petition filed by a prisoner in state custody solely on the ground that he "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Death Penalty Act of 1996 ("AEDPA"), sets forth as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted

18

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

We have explained that this provision "mandates a two-part inquiry." Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 880 (3d Cir. 1999) (en banc). "[F]irst, the federal court must inquire whether the state court decision was 'contrary to' clearly established federal law, as determined by the Supreme Court of the United States."[5] Id. "[S]econd, if it was not, the federal court must evaluate whether the state court judgment rests upon an objectively unreasonable application of clearly established Supreme Court jurisprudence." Id. Furthermore, we recognize that, in conducting this inquiry, "[f]actual issues

---

[5] Although Dellavecchia has argued that the state courts unreasonably applied federal law, he has not argued that the state courts' decisions were contrary to clearly established federal law, nor has he rebutted the Commonwealth's contention that such decisions were not contrary to such law. Therefore, our analysis does not address that part of the AEDPA test.

determined by a state court are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence." Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000) (citing 28 U.S.C. § 2254(e)(1)).

It is a well-established principle that "habeas corpus is not to be used as a second criminal trial, and federal courts are not to run roughshod over the considered findings and judgments of the state courts that conducted the original trial and heard the initial appeals." Williams v. Taylor, 529 U.S. 362, 383, 120 S.Ct. 1495, 1508 (2000). Rather, the Supreme Court has "long insisted that federal habeas courts attend closely to those considered decisions, and give them full effect when their findings and judgments are consistent with federal law." Id. The respect given to state-court decisions by the federal courts on habeas proceedings is demonstrated by "the fact that [even if] constitutional error occurred in the proceedings that led to a state-court conviction [that circumstance] may not alone be sufficient reason for concluding that a prisoner is entitled to the remedy of habeas." Id. at 375, 120 S.Ct. at 1503 (citations omitted).

> B. Constitutionality of the Admission of the Statement Pursuant to Established Sixth Amendment Precedent

The Sixth Amendment, made applicable to the states through the Fourteenth Amendment, provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend VI. Dellavecchia relies on the progeny of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199 (1964), to contend that the trial court's admission of his hospital statement

20

to Willoughby was an "unreasonable application of" Supreme Court precedent.

The Sixth Amendment "serves to safeguard the adversarial process by ensuring that once the right to counsel has attached the accused 'need not stand alone against the State' at any 'critical stage' of the aggregate proceedings against him."[6]  Bey v. Morton, 124 F.3d 524, 528 (3d Cir. 1997) (quoting Estelle v. Smith, 451 U.S. 454, 470, 101 S.Ct. 1866, 1876-77 (1981)).  The Supreme Court long has held that "an individual who stands indicted of a crime is denied his right to counsel when agents of the state circumvent that right by 'deliberately eliciting' inculpatory statements from him in the absence of his counsel, absent a voluntary and knowing waiver."  Id. (alteration omitted) (quoting Michigan v. Harvey, 494 U.S. 344, 348-49, 110 S.Ct. 1176, 1179 (1990)).  The "deliberate elicitation" doctrine is derived from Massiah, a case in which the Court concluded that the Sixth Amendment protections extend to "indirect and surreptitious interrogations as well as those conducted in the jailhouse."  Massiah, 377 U.S. at 206, 84 S.Ct. at 1203.

The Supreme Court applied this doctrine in the well-known case of Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232 (1977), which involved a Christmas Eve murder of a ten-year-old girl in Des Moines, Iowa.  Id. at 390, 97 S.Ct. at 1235.  Two days after the girl disappeared while her whereabouts still were unknown, an individual who became the defendant in the case, Robert Williams, on advice of a Des Moines attorney, Henry

---

[6] The Commonwealth does not dispute that Dellavecchia's Sixth Amendment right to counsel had attached at the time that he made his post-arraignment hospital statement.

21

McKnight, turned himself in to the police in Davenport, Iowa, 160 miles from Des Moines. Id. In Davenport, a second attorney represented Williams at his arraignment and advised Williams not to make any statements until he consulted with McKnight. Id. at 391, 97 S.Ct. at 1236. Moreover, the police advised Williams of his Miranda rights while he was in Davenport.

After Williams surrendered, two officers from the Des Moines police department traveled to Davenport to take custody of him to transport him to Des Moines. Id. Before the trip, McKnight, who was waiting in Des Moines, advised Williams on the telephone not to speak to the officers while they were taking him to Des Moines. Id. at 391, 97 S.Ct. at 1235. Moreover, McKnight told the officers not to interrogate him. Id. at 391, 97 S.Ct. at 1236. The Supreme Court indicated that "[a]t no time during the trip did Williams express a willingness to be interrogated in the absence of an attorney. Instead, he stated several times that '[w]hen I get to Des Moines and see [my attorney], I am going to tell you the whole story.'" Id. at 392, 97 S.Ct. at 1236.

During the transport, a Des Moines detective delivered what has since been called the "Christian burial speech." Id. The detective, who knew that Williams was an escaped mental patient and a deeply religious man, id. at 403, 97 S.Ct. at 1241, asked Williams to think about the fact that the weather conditions were poor and a delay in identifying the location of the girl's body could prevent her eventual discovery, thus denying her parents the ability to give her a "Christian burial." Id. at 392-93, 97 S.Ct. at 1236-37. Following this speech, Williams informed the officers that he would show them the location of the body, and ultimately he did so. Id. at 393, 97

22

S.Ct. at 1237.

The critical point in the Supreme Court's opinion holding that there was a Sixth Amendment violation was that a detective transporting him to Des Moines "deliberately and designedly set out to elicit information from Williams just as surely as—and perhaps more effectively than—if he had formally interrogated him." Id. at 399, 97 S.Ct. at 1240. The Court expressly noted that "he purposely sought during Williams' isolation from his lawyers to obtain as much incriminating information as possible." Id. In the Court's view, this approach amounted to an interrogation so that its occurrence in the absence of counsel constituted a violation of Williams's Sixth Amendment rights. Id. at 401, 97 S.Ct. 1240-41.

The Supreme Court's development of Sixth Amendment law continued in United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183 (1980). In Henry, the government obtained the assistance of a confidential informant inmate housed in the same cellblock with Henry who was then awaiting trial for bank robbery. Id. at 266, 100 S.Ct. at 2184. The FBI agent in charge of the investigation instructed the confidential informant "to be alert to any statements" but "not to initiate any conversation with or question Henry regarding the bank robbery." Id. at 266, 100 S.Ct. at 2184-85. Ultimately, the informant testified at trial that he had "an opportunity to have some conversations with Mr. Henry while he was in jail" and Henry had "described to him the details of the robbery[.]" Id. at 267, 100 S.Ct. at 2185 (internal quotation marks omitted).

The Supreme Court concluded that the above interaction was impermissible. Id. at 274, 100 S.Ct. at 2189. The Court highlighted the fact that, according to the testimony of the

23

informant, he was "not a passive listener; rather, he had some conversations with Mr. Henry while he was in jail and Henry's incriminatory statements were the product of this conversation." Id. at 271, 100 S.Ct. at 2187 (internal quotation marks omitted). The Court likewise emphasized that Henry was unaware of the inmate's role as a government informant. Id. at 272, 100 S.Ct. at 2188. In light of these factors, the Court held that "[b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." Id. at 274, 100 S.Ct. at 2189.

In contrast to what happened in Henry, the Supreme Court found that the facts in Kuhlmann did not constitute a Sixth Amendment violation. Kuhlmann, like Henry, involved a jailhouse informant, but in Kuhlmann the trial court expressly noted that the defendant's statements to the informant were "unsolicited" and "spontaneous." Kuhlmann, 477 U.S. at 440, 106 S.Ct. at 2620 (internal quotation marks omitted). Specifically, the trial court found that the informant "at no time asked any questions with respect to the crime" and that he "only listened to [the defendant] and made notes regarding what [the defendant] had to say." Id. (internal quotation marks omitted). The Supreme Court made clear that "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached[.]" Id. at 459, 106 S.Ct. at 2630 (quoting Maine v. Moulton, 474 U.S. 159, 176, 106 S.Ct. 477, 487 (1985)). Rather, to show a violation, "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." Id.

24

Applying the Supreme Court's Sixth Amendment precedent to the facts here, we conclude that Willoughby by his conduct did not deliberately elicit a statement from Dellavecchia.[7] As was true of the informant in <u>Kuhlmann</u>, Willoughby did nothing more than listen to a defendant's spontaneous and unsolicited statement that was both unprompted and willingly provided. In contrast to what happened in <u>Brewer</u> where the Court found "no serious doubt" that the police officer "deliberately and designedly set out to elicit information," here the state courts concluded that Willoughby did not go to the hospital with the intent to question Dellavecchia. <u>Brewer</u>, 430 U.S. at 499, 97 S.Ct. at 1240. We have no basis on which to reject that finding. Moreover, Dellavecchia asked whether—and was advised by Willoughby that—anything he said could be used against him. Thus, Willoughby rather than eliciting a statement from Dellavecchia in effect encouraged him to remain silent. After all, a police

---

[7] Although our analysis turns, as it must, on "clearly established federal law[] as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), our conclusion also comports with our own precedent. In <u>Bey v. Morton</u>, we analyzed the Supreme Court's Sixth Amendment line of cases to determine if "there are any circumstances under which the state can deliberately undertake to secure incriminating information from a represented defendant in the absence of counsel and can thereafter use in court the incriminating information it obtains." 124 F.3d at 530. We concluded that the "answer that has evolved is that it can, only if there is not 'elicitation'—only if the government does no more than listen." <u>Id.</u> "It cannot if the police or their informants question or otherwise encourage or facilitate the defendant's discussion of the crime, and this is true even if the defendant initiates the discussion of the criminal conduct." <u>Id.</u>

officer seeking to induce a defendant to make a statement would recognize that he would not be doing so by warning the defendant that if he made a statement, his statement could be used against him.

In light of the unassailable state-court findings on the motion to suppress, the Superior Court, in affirming the common pleas court's decision denying the motion with respect to Dellavecchia's spontaneous statement, did not come to a conclusion that unreasonably applied clearly established Federal law as determined by the Supreme Court and did not make an unreasonable determination of the facts.[8] In short, there is nothing in the Massiah line of cases requiring a police officer to reject or ignore a defendant's voluntary statements. To the contrary, when a defendant provides an uninterrupted narrative about his offenses, a state has no obligation to hinder him in making that statement and is not required to persuade an otherwise willing individual to remain silent.

Even though the Supreme Court has said "that the clear rule of Massiah is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him," Brewer, 430 U.S. at 401, 97 S.Ct. at 1240, spontaneous and unprompted statements voluntarily provided to the police may be used at trial when there has not been an interrogation of the type the Court described in Brewer. Here there was no such interrogation so Dellavecchia's statement could be used at the trial.

---

[8] While we review the Superior Court decision, we would reach the same result if we directly were reviewing the common pleas court's decision.

C.  Harmless Error

Finally we point out that even if the state courts erred when they did not exclude evidence of Dellavecchia's statement, we still would affirm the District Court order denying Dellavecchia's petition because the evidence of Dellavecchia's guilt was overwhelming.  See Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 1721-22 (1993); Alston v. Redman, 34 F.3d 1237, 1252 (3d Cir. 1994).  It is well established that "[t]he writ of habeas corpus has limited scope" as "the federal courts do not sit to re-try state cases de novo, but, rather, to review for violation of federal constitutional standards."  Milton v. Wainwright, 407 U.S. 371, 377, 92 S.Ct. 2174, 2178 (1972).  But "[i]n that process we do not close our eyes to the reality of overwhelming evidence of guilt fairly established in the state court . . . ."  Id.  Applying this principle to the facts at hand, we conclude that the unchallenged evidence of Dellavecchia's guilt would require that we affirm the District Court's order denying his petition even if there was a Sixth Amendment violation because it is clear that the admission of Dellavecchia's statement was harmless even if judged on the most exacting standard.

To start, there is no dispute that Dellavecchia shot and killed Scott Robins.  After all, Dellavecchia conceded this point numerous times during his testimony at trial.  Thus, Dellavecchia does not dispute Robins's identification of him to Bongiorno as his shooter at the time the police arrived on scene.  Rather, Dellavecchia's sole defense was that he shot and killed Robins in self-defense during a struggle.  But the physical evidence cannot be reconciled with Dellavecchia's self-defense account of the homicide.  The medical examiner's testimony showed that two of the three penetrating gunshot wounds entered Robins's body through his right lower back and his left buttock, thus indicating that Robins was shot with his back to

27

his shooter—a point which is consistent with the testimony of Robins's colleague, Richard Wallace. Moreover, the medical examiner noted that the lack of soot or stippling on Robins's body indicates that the shots were fired from more than three feet away, again contradicting Dellavecchia's testimony that the shots were fired during a hand-to-hand struggle. Finally, photographs entered in evidence as well as the testimony of the officer who transported Dellavecchia from his residence to the police station contradicted Dellavecchia's testimony that he had two black eyes and various other facial injuries as a result of this struggle. In short, we hold that even if Willoughby's testimony regarding the October 11 statement was improperly admitted at trial, such admission was harmless in light of the overwhelming evidence of Dellavecchia's guilt.[9]

## V. CONCLUSION

For the foregoing reasons, we will affirm the District Court's order of March 2, 2015, denying Dellavecchia's petition for a writ of habeas corpus.

---

[9] Although we focus our harmless error analysis on the murder conviction, it applies to all of the offenses for which the jury convicted Dellavecchia.